THE STATE OF RHODE ISLAND, COMPLAINANT, v. THE STATE OF MASSACHUSETTS, DEFENDANT.

The grant of Massachusetts, confirmed in 1629, included the territory "lying within the space of three English miles on the south part of Charles River, or of any or every part thereof."

In 1662, the grant of Connecticut called to be bounded on the north by the line of the Massachusetts plantations.

In ⌐⌐53, the grant of Rhode Island called to be bounded on the north by the southerly line of Massachusetts.

Whether the measurement of the three miles shall be from the body of the river, or from the head-waters of the streams which fall into it, is not clear. The charter may be construed either way without doing violence to its language.

The early exposition of it is not to be disregarded, although it may not be conclusive.

In 1642, Woodward and Saffrey fixed a station three miles south of the southernmost part of one of the tributaries of Charles River.

An express order of the crown was not necessary to run this line, as it was not then a case of disputed boundary.

In 1702, commissioners were appointed by Massachusetts and Rhode Island to run the boundary-line, who admitted the correctness of the former line.

In 1710, Rhode Island appointed an agent to conclude the matter on such terms as he might judge most proper, who agreed that the stake set up by Woodward and Saffrey should be considered as the commencement of the line.

In 1711, Rhode Island sanctioned this agreement.

In 1718, Rhode Island again appointed commissioners with power to settle the line, who agreed that the line should begin at the same place. This was accepted by Massachusetts and Rhode Island, the line run accordingly by commissioners, and the running approved by Rhode Island.

The allegation that the commissioners of Rhode Island were mistaken as to a fact, and believed that the stake was within three miles of the main river and not one of its tributaries, is difficult to establish, and cannot be assumed against transactions which strongly imply, if they do not prove, the knowledge.

If the first commission was mistaken, it almost surpasses belief that the second should again be misled.

To sustain the allegation of a mistake, it must be made to appear, not only that the station was not within the charter, but that the commissioners believed it to be within three miles of the river, and that they had no knowledge of a fact as to the location of it which should have led them to make inquiry on the subject.

Even if the calls of the charter had been deviated from, which is not clear, still Rhode Island would be bound, because her commissioners were authorized to compromise the dispute.

It is doubtful whether a court of chancery could relieve against a mistake committed by so high an agency, in a recent occurrence. It is certain that it could not, except on the clearest proof of mistake.

This mistake is not clearly established, either in the construction of the charter, or as to the location of the Woodward and Saffrey station.

Even if the mistake were proved, it would be difficult to disturb a possession of two centuries by Massachusetts under an assertion of right, with the claim admitted by Rhode Island and other colonies in the most solemn form.

For the security of rights, whether of states or individuals, long possession, under
  a claim of title, is protected.   And there is no controversy in which this great
  principle may be invoked with greater justice and propriety, than in a case of
  disputed boundary.

THIS was a case of original jurisdiction in the Supreme Court,
which now came up for final argument, having been partly dis-
cussed at a former term, and reported in 12 Peters.

A full statement of the case, with an analysis of the historical
documents filed by the respective parties, would require a volume.
The facts are summarily recited in the opinion of the court, which
the reader is requested to peruse before reading the arguments of
counsel.

The case was argued by *Mr. Randolph* and *Mr. Whipple*, on
the part of Rhode Island, and by *Mr. Choate* and *Mr. Webster*,
on the part of Massachusetts.

The points of the arguments will be sufficiently understood by
transcribing the briefs of the respective counsel.   *Mr. Randolph*
opened the case for the complainant.   *Mr. Choate* and *Mr. Web-
ster* followed, on the part of the defendant, and *Mr. Whipple* con-
cluded the argument, on behalf of Rhode Island.

The brief on the part of the complainant was as follows : —

1st. That the words in the charter of Massachusetts of 1628,
" three miles north of the Merrimack River, and the most north-
erly part thereof, and three miles south of Charles River, and the
most southerly part thereof," according to their usual, ordinary,
and long-established import, authorized lines three miles north and
south of the Merrimack and Charles proper, and did not compre-
hend the tributary streams of either.

2d. That this was the construction given to the above words by
the first settlers, and the colonial government of Massachusetts ;
that they not only thus limited their claim, but erected a bound-
house three miles north of the Merrimack proper, near its mouth,
in 1636, at a period when rival and opposing claims, as well as ad-
versary settlements all along the line, forewarned her that she had
reached the utmost limit of her chartered rights.

3d. That, notwithstanding these stimulating inducements, Massa-
chusetts neglected to exercise any jurisdiction over a very large
body of inhabitants, who had possessed the territory immediately
north of her from 1621 until 1641, when, upon " the reiterated
and earnest solicitation of the inhabitants," she received under her
protection these inhabitants, who, according to her subsequent and
very ambitious pretensions, had been all along her own people, upon
her own soil, and famishing for want of sustenance and protection
from their own government.

4th. That in 1638, 1639, and up to 1642, Massachusetts sur-

veyed both her northern and southern lines. Taking the same principle as her guide on both her borders, she found the source of the tributary streams of the Charles on the south, and the Merrimack on the north, running her south line at or near the Woodward and Saffrey station, and her north from some part of Lake Winnepiseogee, thereby embracing all the State of New Hampshire, and nearly all the State of Maine, and she extended a jurisdiction, savoring strongly of conservatism, if not of severity, over both.

5th. That Massachusetts continued to exercise her jurisdiction over these extended limits from 1641 till 1676, except being ordered away from Maine by the king's commissioners, somewhere about 1660, which order she disobeyed, when John Mason, the proprietor of New Hampshire, presented his petition to the king. The merits of the claims were closely scrutinized by the king and council, aided by the chief justices of the King's Bench and Common Pleas. Massachusetts was unsuccessful in her new pretensions, and obliged to retire to the old bound-house, upon the Merrimack proper.

6th. That the decree of the king and council of 1677 was not a judicial decision merely, which other judicial bodies are at liberty to respect or not, according to its merits, but the decision of a grantor in relation to a grant, revocable in its very nature, — a grant of jurisdiction, and not of territory ; that consequently the will of the king, thus expressed, was tantamount to a revocation of the old grant, and the issuing of a new one.

7th. That the agreement of 1710 and 1718 was entered into by the Rhode Island commissioners, upon the representation of the Massachusetts commissioners that the Woodward and Saffrey station was three miles from Charles River proper, and not three miles from any of its tributary streams, as is stated in the answer of Massachusetts. That no such pretension was then made, or ever made by Massachusetts after said decision of 1677. On the contrary, the whole entire agreement of 1710 – 1718 was entered into by Rhode Island, under the full belief that said station was three miles, and no more, from Charles River proper.

8th. That the only matter in dispute between said commissioners, from the first to the last, was not as to the station or starting-place, but in regard to the course of the line ; that no compromise was ever proposed by either party as to the starting-point ; that both parties agreed upon the Woodward and Saffrey station, because it was represented and believed to be three miles from Charles River proper, according to charter ; and that this mistake was not discovered until 1750.

9th. That in 1750 Rhode Island appointed commissioners to meet those of Massachusetts, in order to complete the execution of the agreement of 1710 – 1718 ; that being unable to find the Woodward and Saffrey station (still believed to be three miles from

Charles River proper), they were obliged to measure three miles from the river, and run an east and west line from its termination; that they erected monuments upon that line (four miles north of the pretended Woodward and Saffrey station), and the State of Rhode Island has claimed to that line, indicated by said bounds, still remaining, from that day to the present.

10th. That it was never pretended by Massachusetts that the Woodward and Saffrey station was the fruit of compromise, or that it was three miles from the tributaries of Charles River, until as late as 1790, when the commissioners of Massachusetts endeavoured to defend their claims upon that basis; that, on the contrary, Massachusetts, from 1710 – 1718 up to 1790, through her commissioners, uniformly claimed to the Woodward and Saffrey station, as being according to charter; and the agreement of Rhode Island of 1710 – 1718 as her title, and her only title, according to charter.

11th. That the assertion of the answer, that Massachusetts had claimed still further south (to the angle tree), and that Rhode Island claimed to Charles River proper, and that, upon these rival and opposing claims, a medium station was adopted, is contrary to the entire body of the evidence in the case, contrary to the fact, and mainly, if not entirely, the offspring of the active imaginings of learned and anxious counsel.

12th. That the answer is no evidence, coming from a corporation, in any case; much more as to matter not responsive to the bill.

13th. That Massachusetts never granted to the town of Providence the five thousand acres of land stipulated and covenanted to be granted by said agreement of 1710 – 1718; and that, in a court of equity, although covenants are independent, yet one will not be enforced without a full performance of the other. Best on Presumptions.

14th. Upon these facts the plaintiffs will contend that the agreement of 1710 was void, —

1. Because made under an evident and apparent mistake.

2. That it cannot operate to transfer four miles of the acknowledged territory of Rhode Island, because Rhode Island, as a colony, had no power to transfer her jurisdiction to Massachusetts.

3. That no confirmation can be presumed, because a confirmation of a void agreement is void itself.

4. Because a confirmation must have been of record in England, and also in Massachusetts, if not in Rhode Island; and that no case has gone the length of presuming the loss of a record, without some foundations being first laid to support such presumption.

5. Because Massachusetts has always claimed under the agreement of 1710 – 1718, and never alleged or pretended that there was any other title.

6. Because the subject of the bounds of Massachusetts, involving the dispute in the present case, has been at various periods before the commissioners of the king, 1664 ; before the king and council, 1677, 1737 ; and at various other times between Connecticut and Rhode Island ; and no such confirmation has ever been suggested, but the direct reverse.

### Cases as to Mistake of Facts.

"A man is presumed to know the law. But no man can be presumed to be acquainted with all matters of fact, and therefore an ignorance of facts does not import culpable negligence." Story's Equity Jurisprudence, 156.

"The general rule is, that an act alone, or contract made under a mistake or ignorance of a material fact, is voidable and relievable in equity." Ibid., 155.

If instruments be delivered up by mistake, and owing to ignorance of a transaction which would have made it unconscientious to hold the instrument and proceed at law, equity will relieve. 1 Madd. Ch. Practice. The case cited is the East India Company *v.* Donald, 9 Ves. jr., from 275. A charter-party was delivered up to the defendant, after a voyage, the provisions of which he had violated, the plaintiff being ignorant of the violation. It was agreed that there was no fraud nor misrepresentation, but the court said there was a plain mistake.

Tompkins *v.* Bernet, 1 Salk. 22. One of three persons paid money on a usurious bond, and afterwards recovered it back as paid by mistake, he not knowing the fact of the usury.

Bingham *v.* Bingham, 1 Ves. sen. 126, in 1748. "An agreement was made for the sale of an estate to the plaintiff by defendant, who had brought an ejectment in support of a title thereto under a will.

"The bill was to have the purchase money refunded, as it appeared to have been the plaintiff's estate.

"It was insisted that it was plaintiff's own fault, to whom the title was produced, and who had time to consider it.

"Decreed for the plaintiff, with costs, and interest for the money from the time of bringing the bill ; for the no fraud appeared, and the defendant apprehended he had a right. Yet there was a plain mistake, such as the court was warranted to relieve against, not to suffer the defendant to run away with the money, in consideration of the sale of an estate to which he had no right."

Rhode Island gave away her own territory, instead of the territory which Massachusetts was entitled to.

Gee *v.* Spencer, 1 Vernon, 32. A release set aside by reason of the misapprehension of the party. Luxford's case cited.

2 Ves. sen. 400. A general release relieved against, as to particulars not in the knowledge of the party.

Evans *v.* Llewellyn, 2 Bro. Ch. Cas. 150. A conveyance set aside, as improvidently entered into ; though no fraud or imposition.

N. B. The report of this case is more full in Cox. See Leonard *v.* Leonard, 2 Ball and Beatt. 184.

An omission in an agreement by mistake stands on the same ground as an omission by fraud. Chitty's Dig., tit. *Mistake.*

Ramsbottom *v.* Gordon, 1 Ves. & B. 168 ; 3 Atk. 388 ; 4 Bro. Ch. Cas. 514 ; 6 Ves. 334, note *c.*

Cocking *v.* Pratt, 1 Ves. sen. 400. J. Self, dying intestate, left a widow and daughter, then an infant, who, four months after coming of age, entered into an agreement with her mother concerning the distribution of the personal estate ; which agreement was afterwards ratified by the daughter's husband. After the daughter's death, the husband brought a bill, as her administrator, to set aside the agreement, and to have a distributive share according to her right.

Master of the Rolls. " The daughter clearly did not intend to take less than her full share, her two-thirds of the value, though what that was did not clearly appear ; but she thought what was stipulated for her was her full share.

" The court will look with a jealous eye upon a transaction between parent and child. Whether there has been *suppressio veri* does not clearly appear.

" But there is another foundation to interpose, that it appeared afterwards that the personal estate amounted to more, and the party suffering will be permitted to come here to avail himself of that want of knowledge, not indeed in the case of a trifle, but some bounds must be set to it. The daughter would be entitled to five or six hundred pounds more, which is very material in such a sum as this, and a ground for the court to set it right. The daughter did not act on the ground of a composition, but took it her full share ; and if it appears not so, the court cannot suffer the agreement to stand. As to the ratification by the husband, he was as much in the dark."

Griffith *v.* Trapwell, June, 1732, was cited in the above case, " where one died intestate, leaving two sisters, the plaintiff's wife and the defendant's wife. The latter first got administration, and prevailed on the other to accept of an agreement for her share. There was a further agreement, that the plaintiff's wife should have a further share, reciting that she should have an equal share, and that there should be a decree for that. The plaintiff afterwards discovered the estate to be a great deal more, and brought a bill of review, and both the decree and agreement were set aside."

Pooley et al. *v.* Ray, 1 Peere Wms. 354. The executor of a mortgagee, coming before the master, and not admitting any of his mortgage to have been paid, proved his deed, and got a report for

the whole amount of his debt, £700, which report was afterwards confirmed and made absolute. Afterwards it appeared, under the mortgagee's own hand, that £353 had been paid by the mortgagor. The defendant had paid this money away to creditors.

Master of the Rolls. "Let the master see whether there has been a double payment, and as to so much as has been overpaid it must be allowed to the plaintiffs." This, on appeal, was confirmed by Lord Cowper.

Honor v. Honor, 1 Peere Wms. 123. Articles, and a settlement mentioned to be made in pursuance thereof, were both made before marriage, but the settlement varied from the uses of the articles. Decreed to set the settlement aside.

Chancellor. "It is a plain mistake in varying the settlement from the articles, and this appearing upon the face of the papers, the plain reason of the thing, length of time, is immaterial." Same case, 2 Vern. 658; 1 Madd. Ch. 61.

But though a court of law will not grant a new trial merely to enable a party to get fresh witnesses, nor would a court of equity interfere on such grounds; yet where the admissions come from the party himself, upon a bill of discovery, filed after the trial, it is very different, and the court will in such case relieve. 1 Maddock's Ch. 77; Harkey v. Vernon, 2 Cox, 12.

Under peculiar circumstances, however, excusing or justifying the delay, courts of equity will not refuse their aid in furtherance of the rights of the party; since in such cases there is no pretence to insist on laches or negligence, as a ground of dismissal of the suit. 1 Story's Eq. Jurisp. 503, 504; Lobdell v. Creagh, 1 Bligh (N. S.), 255; 1 Fonbl. Eq., B. 1, ch. 4, p. 27, and notes; Jeremy on Eq. Jurisp., B. 3, pt. 2, ch. 5, pp. 549, 550.

If the legatee allege that he knew not of his right, time is no bar. Nor when fraud is proved. Fonbl., as above.

Garland v. Salem Bank, 9 Mass. R. 408. An indorser paid a note, ignorant that no demand had been made upon the maker or notice to himself, though he was advised not to pay it. Held to be a payment by mistake, and he recovered back again. 4 Mass. R. 378; 3 Mass. R. 74; 5 Burr. 2672; 1 Durn. & East, 712; 1 Bos & Pull. 326; Doug. R. 638.

The case of The Union Bank v. The Bank of the United States, 3 Mass. R. 74, is a strong case. The marginal note is, — "If A., confiding, though improperly, in the mistaken affirmation of B., pay him money, A. shall recover it back."

The case was, the branch bank had received two bad checks, which they supposed they had received from the Union Bank. They sent them to the Union Bank by their messenger, stating that they came from the Union Bank; whereupon the Union Bank paid them. Between the time of paying them by the Union Bank and the discovery of the mistake, Rawson, who drew them, failed and

absconded ; so that the branch bank lost the amount.    Judge Parsons and the Supreme Court decided that the loss must fall on the branch bank, who committed the first error.

The cases in Douglass and Bos. & Pull. are both cases of payments by mistake, and as strong as the two cases in Mass. Reports.

### Cases of Settlements and Marriage Articles being reformed on Account of Mistake.

Randall *v.* Randall, 2 Peere Wms. 464, in 1728.    In that case, the husband had confessed, under hand and seal, that both the articles and settlement limited the estate to his heirs in fee, when it was the intention of the mother of his wife to limit it to the heirs of the wife in fee.    The articles and settlement were reformed. Lord Chancellor King decreed the estates to be settled upon the heirs of the wife in fee.

West *v.* Erissey, 2 Peere Wms. 349, in 1726.    Where the settlement made, before the marriage, varied materially from the articles, but stated to be made " in pursuance of the articles and performance," the settlement will be presumed to depart from the articles by mistake.

See note of Cox to the above case.    See 3 Bro. Parl. Cases, 347, in 1727.

Honor *v.* Honor, 1 Peere Wms. 123, in 1710, before Lord Chancellor Cowper, establishes the same principle.   The articles limited the estates to the heirs of the body of the wife.    The settlement (made before marriage, and in pursuance of the articles) was to the heirs of the body of the husband of the wife begotten.

Lord Chancellor.    " It is a plain mistake in making the settlement vary from the articles."

After reciting the articles, he further says, — " And the articles being so, the settlement, which is said to be in pursuance of the articles, shows there was no alteration of the intention, nor any new agreement, between the making of the articles and the settlement. And this appearing upon the face of the articles and settlement, and in the plain reason of the thing, length of time is immaterial."

In the case of Motteaux *v.* The London Ins. Co., 1 Atk. 545, in 1739, Halhead, as agent of the plaintiff, paid the defendants fifteen pounds premium, being at the rate of three per cent., which was the current premium then, upon the ship, at and from Fort St. George, and a label of such agreement was, on the 7th of August, 1733, entered in a book, and subscribed by Halhead and two of the directors.   The policy was made out from Fort St. George. Lord Hardwicke rectified the mistake, saying that the policy ought to have conformed to the label.

In Baker *v.* Paine, 1 Ves. sen. 458, in 1750, Lord Hardwicke rectified an agreement by previous minutes of the parties.

In Barstow *v.* Kilvington, 5 Ves. jr. 592, Lord Eldon rec-

tified a settlement by a previous letter of the party. See also a similar case cited in a note to that case.

### Cases of Compromise.

If a person, after due deliberation, enter into an agreement for the purpose of compromising a claim made *bonâ fide*, to which he believes himself to be liable, and with the nature and extent of which he is fully acquainted, the compromise of such a claim is a sufficient consideration for the agreement, and a court of equity, without inquiring whether he in truth was liable to the claim, will compel a specific performance. Atwood v. ——, 1 Russell, 353; 5 Russell, 149, affirmed on appeal.

If a party, ignorant of plain and settled principle of law, is induced to yield a portion of his indisputable right, equity will relieve; but where title is doubtful, and with due deliberation he enters into compromise, no relief is given, nor is consideration inquired into. 1 Sim. &. Stu. 564.

No remedy in equity for the recovery of money paid on compromise of an action, where the party had full knowledge of the facts, and the means of proving them at the trial. Goodman v. Sayers, 2 Jac. &. Walk. 249.

A compromise of rights, doubtful in point of law, but founded upon a misrepresentation or suppression of facts in the knowledge of one of the parties only, cannot be supported. Leonard v. Leonard, 2 Ball & Beatt. 171.

To constitute a fair compromise of right doubtful in point of law, the facts creating this doubt should be fairly stated. Ibid. 181.

It is essential to the validity of a compromise that both parties be in equal ignorance. Ibid. 182.

Defence of compromise is not proper for answer, but for plea only. 1 Ball & Beatt. 323.

### Authorities as to Presumptions of Title.

" A grant of land will never be presumed from lapse of time, unless it be so great as to create the belief that it was actually made, or unless the facts and circumstances show that the party to whom it is presumed to have been made was legally or equitably entitled to it." Note to Mathews on Presumptions, 296, ed. of 1830; 6 Cowen, 706; 3 Johns. 269, 109; 1 Wash. C. C. R. 70.

No possession of one claiming under a defective title can raise a presumption of a good title. Mathews, 198, note; 5 Harris & Johns. 230; 1 Harris & Johns. 18; Beal v. Lynn, 6 Harris & Johns. 336.

" Presumptions of law are suppositions or opinions previously formed on questions of frequent occurrence, being found, from experience, to be generally accordant with truth, and remain of force until repelled by contrary evidence.

" Presumptions of fact are conclusions drawn from particular cir-
cumstances. Many of the presumptions of law were formerly con-
sidered too powerful to admit of contradiction, but this doctrine is
now confined principally to the doctrine of estoppels." Mathews,
2 ; Phillips on Evidence, 6th ed., 146.

" The grounds upon which legal presumptions rest are various.
In some cases on the laws of nature and the general principles of
justice, on the nature and general incidents of property. In others,
on those innate principles of self-interest and prudence,.which gen-
erally govern the conduct of men," &c. Mathews, 2.

Other legal presumptions originate in the policy of the law. Of
this description, however, as they relate to property, examples are
rare.

" Presumptions of fact are such as are usually found by ex-
perience to be consequent upon, or coincident with, the facts pre-
sumed. They must correspond with, and be adequate to account
for, the circumstances actually proved." Mathews, 4.

" Legal presumptions generally apply to facts of a transitory
character, the proper evidence of which is not usually preserved
with care ; but not to records or public documents, &c., unless
proved to have been lost or destroyed." Mathews, 4, in note ;
Brunswick v. McKean, 4 Greenleaf, 511.

" Presumptions from evidence of the existence of particular facts
are, in many cases, if not all, mixed questions of law and fact. If
the evidence be irrelevant to the fact insisted upon, or such as can-
not fairly warrant a jury in presuming it, the court would err in
instructing them that they are at liberty to presume it." Ibid. p.
5, note ; Bank of United States v. Corcoran, 2 Peters's S. C. R.
133.

" Following up this principle, courts will, in favor of long pos-
session, presume as well the existence of the needful instruments
of conveyance, as the observance of all such acts and solemnities
as are requisite to make actual assurances valid."

Fines and recoveries are an exception, which cannot be pre-
sumed without evidence directly pointing to them.

Act of parliament, and grants from the crown, though assuran-
ces of record, are constantly presumed, within even the time of
legal memory. Cowp. 102, 215 ; Jac. & Walk. 63, 159 ; 11
East, 488. See Am. authorities in note, p. 6, Mathews.

" Ignorance has sometimes, in courts of equity, been held to
afford an answer to averred releases of demands. The desertion
of a right, it has been judicially observed, always supposes a pre-
vious knowledge of it. It is absurd to say that a man has relin-
quished a right of which he is not aware." Mathews, 17, 18 ;
Sel. Ch. Cas. 11 ; 2 Peere Wms. 736 ; per Sir Wm. Grant,
2 Mer. 362.

In England there is but little difference between the doctrine of

Rhode Island *v.* Massachusetts.

prescription, and the doctrine of presuming lost grants, in regard to the objects embraced by the two principles.

The doctrine of prescription never extended to lands in fee, or corporeal hereditaments, nor did it extend to such incorporeal rights as could exist only by matter of record ; such as many species of royal franchise, deodands, traitors' or felons' goods, &c.

On the other hand, the doctrine of presuming grants never extended to corporeal hereditaments ; but, unlike the doctrine of prescription, it embraced all incorporeal hereditaments, whether evidenced by matters of record, or purely by grant. Patents from the crown, and acts of parliament even, were presumed to exist.

The great difference between the two doctrines consisted mainly in the length of time necessary for their successful operation.

Under the doctrine of prescription, as it exists in England to this day, immemorial usage must be established. Therefore, if it appears that the title to be presumed had no existence at any time subsequent to the 1st Rich. 1 (1189), there is an end to the power and agency of prescription.

On the other hand, while the doctrine of presuming grants embraced a rather wider range of objects or titles, its children were deemed legitimate, though comparatively of modern birth.

This latter doctrine, however, during the whole of its minority, experienced considerable opposition from many wise, as well as learned, lawyers. 2 Ev. Poth. 139.

The parliament of England, by the 2d and 3d Wm. 4 (1822), were obliged to remedy some of the evils growing out of judicial fictions. The real property commissioners express themselves as follows : —

"Amid these difficulties, it has been usual of late, for the purpose of supporting a right which has been long enjoyed, but which can be shown to have originated within time of legal memory, to resort to the clumsy fiction of a lost grant, which is pleaded to have been made by some person seized in fee of the servient, to another seized in fee of the dominant, tenement. But, besides the objection of its being well known to the counsel, judge, and jury, that the plea is unfounded in fact, the object is often frustrated by proof of the fact of the two tenements having been such that the fictitious grant could not have been made in the manner alleged in the act."

"In addition to all this," says Best, "it was well observed, that the requiring juries to make artificial presumptions of this kind amounted, in many cases, to a heavy tax on their consciences, which it was highly expedient should be removed. In a word, it became apparent that the evil could only be remedied by legislation, and the statutes of Wm. 4 were passed for that purpose."

" Whether deeds of conveyance can be presumed, in cases where the law has made provision for their registration, has been doubted.

" The point was argued but not decided, in Doe *v.* Hirst, 11 Price, 475. The better opinion seems to be, that though the court will not in such cases presume the existence of the deed as a mere inference of law, yet the fact is open for the jury to find, as in other cases." Note to 1 Greenl. Ev. 52.

In the United States, while the doctrine of presuming a grant has been applied to corporeal as well as to incorporeal hereditaments, and the sphere of its operation very much enlarged, yet, at the same time, the principle of its operation has been circumscribed within very narrow, and in all probability very safe, grounds. It is placed beyond the reach of the innovation of mere book lawyers and book judges, and rests, as a mere matter of fact, upon the common sense of a jury.

The judges in England were obliged to flee to this matter of fact view, as a refuge from the rapidly increasing evils growing out of artificial presumptions. In this country, upon this subject, there are no artificial presumptions. It is simply a case of circumstantial evidence.

In 6 Cowen, 725, it is said :— " A grant of land will never be presumed, unless the lapse of time is so great as to create a belief that it was actually made ; or unless the facts and circumstances show, that the party to whom it is presumed to have been made was legally or equitably entitled to it." Mathews on Presumption, 296, note, ed. 1836 ; 6 Cowen, 706 ; 3 Johns. 109 269 ; 1 Wash. C. C. Rep. 70.

Same principle in 2 Wendell, 13 – 15.

In Ricard *v.* Williams, 7 Wheat. 59, this court decided, that " Presumptions of a grant, arising from a lapse of time, are applied to corporeal as well as to incorporeal hereditaments. They may be encountered and rebutted by contrary presumptions, and can never arise where all the circumstances are entirely consistent with the non-existence of a grant. *A fortiori*, they cannot arise when the claim is of such a nature as is at variance with the supposition of a grant."

" Legal presumptions generally apply to facts of a transitory character, the proper evidence of which is not usually preserved with care ; but not to records or public documents in the custody of officers charged with their preservation, unless proved to have been lost or destroyed." Cowen & Hill's Notes to Phillips, Part 1, p. 364 ; Brunswick *v.* McKean, 4 Greenl. 508.

See Cowen & Hill's notes, generally, on subject of presumptions.

" No possession of one claiming under a defective title can

Rhode Island *v.* Massachusetts.

raise a presumption of a good title." Mathews, 198, note ; 5 Harris & Johns. 230 ; 1 ibid. 10 ; 6 ibid. 336.

"Presumptions from evidence, of the existence of particular facts, are, in many cases, if not all, mixed questions of law and fact. If the evidence be irrelevant to the fact insisted upon, or such as cannot fairly warrant a jury in presuming it, the court would err in instructing them that they are at liberty to presume it." Bank of United States *v.* Corcoran, 2 Peters, 133.

"Ignorance has sometimes, in courts of equity, been held to afford an answer to averred releases of demands.

"The desertion of a right, it has been judicially observed, always supposes a previous knowledge of it.

"It is absurd to say, that a man has relinquished a right of which he is not aware."

Mathews on Pres. 17, 18 ; Sel. Ch. Cases, 11 ; 2 Peere Wms. 730 ; per Sir Wm. Grant, 2 Mer. 362.

### Cases upon Presumptive Evidence.

Beedle *v.* Beard et al., in 4th Ja. 1 (1627), 12 Coke, 5.

In 31st Ed. 1 (1303), the king being seized of the manor of Kimbolton, to which the advowson of the church was appendant, granted said manor, with the appurtenances, to Humphrey de Bohun, Earl of Hereford, in tail general. Humphrey de Bohun, the issue in tail, by his deed, in the 40th Ed. 3 (1367), granted the said advowson, then full of an incumbent, to the prior of Stonely and his successors ; and at the next avoidance they held it *in proprio usus;* and upon this appropriation made *concurrentibus iis quere in jure requirunter.* After the death of the incumbent, the said prior and his successors held the said church appropriate, until the dissolution of the monastery. In 27th Hen. 8 (1530), the said manor descended to Edw., Duke of Buckingham, as issue to said estate tail. The reversion descended to Henry VIII. The Duke, in 13th Hen. 8, was attaint of high treason. In 14th Hen. 8, the king granted said manor, &c., with all advowsons appendant, to Richard Wingfield, and the heirs male of his body. In 16th Hen. 8, it was enacted by parliament, that the Duke shall forfeit all manors, &c., advowsons, &c., which he had in 4th Hen. 8.

The king, 37th Hen. 8, "granted and sold for money the said rectory, &c., of Kimbolton, as inappropriate in fee, which by mesne conveyance came to the plaintiff for £ 12,000. In the 37 Eliz., Beard, the defendant, did obtain a presentation of the queen by lapse, pretending that the said church was not lawfully appropriate to the said prior of Stonely.

"1st. For this, that Humphrey, who did grant it to the said prior, had nothing in it, for that it did not pass to his ancestor by these words, *Manorium cum pertinentibus.*"

In the case, the advowson was bought and paid for in 1303; was in the possession of the first taker, Earl of Hereford, until 1367, sixty-four years. It was then granted to a corporation, the prior of Stonely, in whose possession it remained until the dissolution of the monasteries, in the reign of Henry VIII., 1530, one hundred and sixty-three years more. It descended to the Duke of Buckingham, upon his attainder was forfeited to the crown, and Henry VIII. granted the manor and advowson to the plaintiff for a pecuniary consideration. The action was tried in 4th Ja. 1, 1627, three hundred and twenty-four years after the possession commenced under the first grant.

Mayor of Kingston upon Hull v. Horner, Cowper 102, in 1774.

The declaration stated the right of the plaintiff, as mayor, to certain water-bailiff dues, for certain goods imported into Kingston.

In support of the title, the plaintiff produced, —

1. An entry upon the corporation books, entitled "A particular note of all such duties, &c., as by the water-bailiffs are to be received for the use of the mayor and burgesses of Kingston upon Hull, according to the order prescribed and set down in the year 1441, and continued and put in use from that time to the present day, 1st April, 1575." In this list were included the duties in question.

2. An order of the corporation, in the 13th Eliz., requiring the water-bailiff to keep these duties separate, &c.

Then followed a particular account of the receipt of these duties from 1545 to 1646, from 1648 to 1678, of persons who had rented the office of water-bailiff; also an account of dues for three years in 1726; and the testimony of persons who had paid the dues from 1734; together with an estimate of repairs by the corporation to the amount of £15,000.

The defence was, that the earliest book of the corporation was the 19th Ed. 3 (1346), and the date of their charter the 27th Ed. 1 (1299), a century subsequent to the time of legal memory, Rich. 1, 1199.

That the title, if any, to the duties in question could be supported only by prescription or charter. That the first did not exist, they being a corporation within legal memory. That the charter authorized the erection of the port, but granted no duties.

To this it was answered, that a usage of three hundred years was a sufficient ground to presume a grant of the duties, in consideration of the repairs, which it was in proof the corporation had constantly done from 1441 to the bringing the action.

Lord Mansfield said, there were two grounds to show that the evidence was sufficient to go to the jury : —

1. That there existed a port, with duties belonging to the king, previous to the charter of 5th Rich. 2. Consequently, a grant by Rich. 2 of the port would carry the duties along with it.

Rhode Island *v.* Massachusetts.

2. If this charter erected a new port, the king could not create duties. But that there might be some charter from the king creating and giving these duties, upon a ground which would support them in point of law, namely, upon the consideration of repairs, and the general advantage to be derived to the public from its being properly kept up.

The question that arises upon it is, "Whether, upon the evidence, it was properly left to the jury to presume such grant between 1382 (date of charter) and 1441" (time of first collecting the duties). p. 106.

Lord Mansfield (p. 108). "A jury is concluded, by the statute of limitations, as a bar. So, in the case of prescription, if it be time out of mind, a jury is bound to conclude the right from that prescription, if there could be a legal commencement of the right." Any written evidence, showing a time when the claim did not exist. is an answer to prescription. p. 109.

" But length of time, used merely by way of evidence, may be left to a jury to be credited or not, and to draw their inference one way or the other, according to circumstances." p. 109.

" In questions of this kind, length of time goes a great way ; but there is no positive rule which says, that a hundred and fifty years' possession, or any other length of time within memory, is a sufficient ground to presume a charter." p. 110.

The case of Johnson & Humphrey *v.* Ireland, 11 East, 279, presented the question, whether " the enfranchisement of copyhold may, upon proper evidence, be presumed even against the house."

The evidence offered and rejected by Heath was an entry, in the parliamentary survey, of sixpence rent against these premises for a hundred and sixty years, in the column of freehold, instead of six shillings and sixpence, in the column of copyhold.

The court admitted the evidence, observing that there were persons, between 1636 and 1649, competent to make the enfranchisement, " the king having continued his functions the greater part of the time." p. 283.

Fenwick *v.* Reed, 5 Barn. & Ald. 228, in 1821. In this case, Reed, the defendant, took possession of the estates of the plaintiff, in 1750, under an agreement to remain in possession until the debts were satisfied out of the rents and profits. In 1801, a suit in chancery was instituted by the plaintiff. Much evidence was offered on both sides. Bayley, Justice, told the jury, " that the real question was, whether they believed that a conveyance had actually taken place."

The court approved of this direction, and said, — " In cases where the original possession cannot be accounted for, and would be unlawful unless there had been a grant, the case may be different. Here the original possession is accounted for, and is consistent with the fact of there having been no conveyance. As the defendant's

YY *

ancestors had originally a lawful possession, it was incumbent on them to give stronger evidence of a conveyance."

Abbott, Chief Justice, also says, — "In my opinion, presumptions of grants and conveyances have already gone to too great lengths, and I am not disposed to extend them farther."

Bayley said, — "The question for the jury was a mere question of fact, whether there had been such a conveyance. The deeds of 1747 and 1752 were both produced, and if there had been a conveyance, it would probably have been produced also. No draft of it, or abstract referring to it, was produced. A conveyance of this sort was not likely to have been lost, if it ever existed."

The case of Howson *v.* Waterton, 3 Barn. & Ald. 150 (1819), was a conveyance of copyhold lands (in 1748, by surrender in open court) to charitable uses ; was declared void, for not complying with the provisions of 9 Geo. 2, ch. 36, which requires all conveyances to be executed in the presence of two witnesses, to be enrolled in chancery, and for the party to survive one year.

The court was asked to presume an enrolment.

Abbott, Chief Justice, said, — "No instance can be found, where the court have said that an enrolment has been presumed."

Bayley said, — "As to presuming an enrolment, if it had appeared that the rolls of chancery had been searched, and a chasm had been found about that period, it might have been different." p. 142.

Best, on Presumptions, p. 149, says, — "It has been said, (Beanland *v.* Hirst, Price, 475 ; Phill. & Am. Ev. 476), that the registration of the memorial of a deed in a register county cannot be presumed, and that direct proof must be adduced."

But it is difficult to contend, "that there can be any matter of fact which a jury may not presume from possession and circumstances, when that possession and circumstances are sufficiently strong to convince them of its existence. The true conclusion seems to be, that in the case of a memorial of a deed requiring registry, the court will not direct them to make any artificial presumption."

Best cites 1 Greenleaf's Law Ev., Ar. 46, p. 52. "The same presumption, says Greenleaf (p. 52), has been advised in regard to the reconveyance of mortgages, conveyances from old to new trustees, mesne assignments of leases, and any other species of documentary evidence and acts *in pais* which are necessary for the support of a title, in all other respects evidently just."

"It is sufficient that the party who asks for the aid of this presumption has proved a title to the beneficial ownership, and a long possession not inconsistent therewith ; and has made it not unreasonable to believe, that the deed of conveyance, or other act essential to the title, was duly executed. Where these merits are wanting, the jury are not advised to make the presumption." He cites, among numerous other authorities, Doe *v.* Cooke, 6 Bing.

174 ; 19 Serg. & Lowb. 44 ; Doe v. Reed, 5 Barn. & Ald. 232 ; Livett v. Wilson, 3 Bing. 115 ; 11 Serg. & Lowb. 57; 2 Wend. 14 – 37.

The case of Livett v. Wilson, 3 Bing. 115. "Defendant pleaded a right of way, by deed subsequently lost. Plaintiff traversed the grant. There was contradictory evidence. The judge directed the jury, that, if upon this issue they thought defendant had exercised the right of way uninterruptedly for more than twenty years, by virtue of a deed, they would find for the defendant. If they thought there had been no way granted by deed, they would find for the plaintiff."

The rule to show cause why the verdict for the plaintiff should not be set aside was discharged.

Best, C. J., said, that upon an uninterrupted usage of twenty years, the jury would be authorized to presume a deed. But even in such a case a judge would not be justified in saying they must, but might, find a deed.

Burrough, J., said, — "If there had been such a deed, it is not probable the way would have been constantly in dispute."

The case of Doe v. Cooke, 6 Bing. 174 (19 Serg. & Lowb. 44), was a case of more than twenty years' possession; but the Court of Common Pleas would not presume the surrender of a term. After stating the particular circumstances of that case, Tindall, C. J., says : — "No case can be put in which any presumption has been made, except where a title has been shown by the party who calls for the presumption, good in substance, but wanting some collateral matter to make it complete in point of form. In such case, where the possession is shown to have been consistent with the fact to be presumed, and in such cases only, has it ever been allowed."

Sir Samuel Romilly said, in Whally v. Whally, 1 Merivale's R. 441 (1814): — "Length of time cannot affect this case. The statute does not apply, and it is not easy to see for what purpose it is here insisted upon. Time is no bar to relief in equity, unless it be in the excepted cases of mortgage, &c. In all other cases it only operates by way of evidence."

The bill was filed to set aside a conveyance from an uncle to a nephew after forty years, upon a charge of fraud and gross inadequacy of price. The court sustained the deed, upon the ground that it was not merely for a pecuniary consideration, but, as it stated, was also for "love and affection"; and consequently the court, Lord Eldon, said nothing about time.

The opposite counsel admitted that time was not a bar, by a strict analogy to the rule of law, but that it afforded evidence sufficient to raise a presumption. p. 444.

McDonald v. McDonald, 1 Bligh's R., House of Lords, 1819, was the case of a client against his agent and attorney, upon a

transaction of twenty-five years standing. It was a case of confidence.

The Lord Chancellor Redesdale says: — "The case, therefore, by its circumstances, is taken out of the principles of presumption and prescription, which ought to protect professional men. On these grounds, and a fair view of the case, as a juryman, it is my opinion that the bond was not intimated."

Wood *v.* Veal, 5 Barn. & Ald. 454, was the case of land under lease from 1719 to 1818; and as far as memory could extend had been used by the public, and lighted, paved, and watched, under an act of parliament, in which it was enumerated as one of the streets of Westminster.

It was submitted to the jury by the court whether there had been a dedication to the public, telling them that there might be a highway without a thoroughfare, and telling them that nothing done by the lessee, without the consent of the owner of the fee, would give the right of way to the public. Bayley, J., said, — "Where the consent is by a person having a limited right, it can only continue for a limited period."

Same principle. Barkee *v.* Richardson, 4 Barn. & Ald. 579.

Wright *v.* Smythies, 10 East, 409, is a decision, that no presumption of a grant enrolled can be presumed, because if it existed it might be shown.

In Vooght *v.* Winch, 2 Barn. & Ald. 663, it was said, — "If it is admitted that this was a public, navigable river, and that all his Majesty's subjects had a right to use it, an obstruction for twenty years would not have the effect of preventing his Majesty's subjects from using it." p. 667.

In Mathews on Presumptions, p. 17, it is said, — "That no length of time will raise a presumption in favor of encroachments on the public; at least, no period has as yet been mentioned as binding the community."

Carter *v.* Murcott, 4 Burr. 2163, and 7 East, 199, are cited.

In Stoughton et al. *v.* Baker, 4 Mass. R., Parsons, J., says: — "Every owner of a water-mill or dam holds it on the condition or limitation that a sufficient passage-way is left for the fish. This limitation, being for the benefit of the public, is not extinguished by any inattention or neglect, for no laches can be imputed to the government, and against it no time runs."

In Livett *v.* Wilson, 3 Bing. R. 115, the court instructed the jury, that if they thought there was no deed of the right of way, they must find accordingly, notwithstanding the possession.

Mathews, p. 17, says, — "The apparent assent of the adverse party is, in all cases of this sort, the true and essential source of inference; but it is evident, that, without a total disregard to fact, this cannot be maintained where the claim has formed a constant source of contest."

See Mathews, 19, also, as to a body of creditors, under an assignment to trustees for their benefit, being also an answer to lapse of time, such persons not being expected, in their collective capacity, to use the same diligence as individuals.   3 Ves. 740 ; 12 Ves. 136, 158.

Piatt v. Vattier et al., 9 Peters, 416, 405 (1835), was a case of clear adverse possession for thirty years, without a claim even; or the shadow of an excuse.   The court say, p. 416, — " And we are of opinion that the lapse of time is, upon the principles of a court of equity, a clear bar to the present suit, independently of the statute.   There has been a clear adverse possession of thirty years, without the acknowledgment of any equity or trust estate in Bartel ; and no circumstances are stated in the bill, or shown in evidence, which overcome the decisive influence of such an adverse possession."   Per Story, J.

Miller v. McIntire, 6 Peters, 61, 62 (1832), was the common case of a bill in a court of equity, where the statute of limitation was applied by analogy, and not where time was used as evidence.

### Points of the Respondents.

The complainant's case proceeds upon two propositions ; first, that the charter of Massachusetts of March, 1628, intended to trace as her southern boundary a line *three miles south of what is now the main stream of what is now called Charles River ;* second, that therefore the complainant has the right to have the same line of boundary decreed at this time, without regard to any thing which has taken place since the date of the charter.

Both these propositions the respondents controvert.   And, first, they contend, that the charter intended to trace, as their southern boundary, a line three miles south *of all the waters of the Charles, as a geographical whole ; three miles south of its basin or valley, and of the sources and contributory streams which feed and preserve it.*

To enable the court to determine between these two constructions, they will contend, that it is competent to advert to a great body of extrinsic circumstances and evidence, the character, situation, age, and objects of the parties, their knowledge or ignorance of the localities, the existence or non-existence of distinctive names of contributory streams, and, above all, to the contemporary exposition of the instrument afforded by the acts of parties in the age of the charter and subsequently.

And upon this point they maintain the position, that as the language of the charter, " three miles south of Charles River, and any and every part thereof," is vague, general, and flexible, such extrinsic evidence as is above indicated may be resorted to in order to ascertain the sense in which the parties used it ; that even if the language *primâ fronte* bears a particular legal sense, it may be

shown to have been used in a different one ; that this might be done, even if the grant was recent, and between individuals ; and that it may be done *a fortiori multo* when the instrument is ancient and is the charter of a State.

In support of this proposition of the law of evidence will be cited Greenleaf's Ev. §§ 280, 286 – 288, 290, 295 ; 3 Cowen's Phillips, 1362, 1389 ; 6 Pick. 63 ; 16 Johns. R. 14 ; 16 Wend. 663 ; 6 Mass. R. 435 ; 13 Pick. 261 ; 2 New Hamp. R. 369 ; 1 M. & K. 571 ; 6 Sim. 54 ; 3 Cowen's Phillips, 1403 – 1405 ; 1 Mason, 10, 12 ; 1 Mood. & Malk. 300 ; 19 Johns. R. 313 ; 1 Bing. 445 ; 3 Camp. 16 ; 1 Conn. & Lawson, 223 – 225 ; 3 Barn. & Adolph. 728.

These cases show that the terms in this charter are so far vague and flexible, that even if they legally import the complainant's construction, it may be proved that a different one was intended. 7 Sim. 310 ; 3 Atk. 576. See, too, 16 Peters, 534 ; 2 Inst. 282 ; 2 Brod. & Bing. 403.

Proceeding, then, to discuss the question of the original meaning of the charter, under a view of all the surrounding circumstances, the respondents will maintain, —

1. That the burden of proof is upon the complainants ; and that, being out of possession, never having been in possession, and presenting the question after a lapse of more than two centuries, they should be holden to make their construction clear to judicial certainty ; 13 Pick. 77 ; 2 Brod. & Bing. 403.

2. That the charter is to be construed most liberally in favor of the grantee, because it was a grant from a monopolist to the people of Massachusetts of that and of all generations. 1 Bancroft's History, 292, 293, 351 – 354 ; 11 Peters, 544 ; 7 Pick. 487.

3. That there is no circumstance or consideration in aid of the complainant's interpretation, beyond the words themselves ; that they have never had possession under their interpretation ; that there is no proof that the streams and fountains south of what is now the main stream of what is now Charles River have not always been reputed parts of Charles River ; and that there is proof that anciently they were so reputed. See depositions of Metcalf, Cowell, Ware, and Mann, in papers put into the case by Massachusetts, pp. 30 – 32 ; 1 Douglass's Summ. 415, 463.

4. That there is no judicial evidence that the words themselves, in the age of the date of this charter, used by such parties, in such an instrument, even *primâ fronte*, bore the sense contended for by the complainants ; that they do not obviously import that sense ; and that, in the absence of other evidence, the court would not, against a possession of two centuries, even *primâ facie*, so construe them.

And, *e contra*, in aid of the respondent's interpretation, they will contend, —

1. That presumption favors it, arising from long possession.

2. That if the words may bear two senses, that which is most beneficial to the grantee, the settler, and colonist will be taken, rather than that most beneficial to the monopolist grantor.

3. That the words themselves more obviously and naturally import the sense claimed by the remonstrance.

4. That their construction imputes the more probable, reasonable, and usual conduct to these parties, since, under the complainant's construction, the boundary would be a fluctuating and uncertain one, varying with reputation; and would divide a river between the States, giving the main stream to one and the sources and confluent waters to the other, thus promoting strife. Whereas the obvious design of this charter was to give the whole river to Massachusetts. 1 Howard, 186.

5. That the whole question is settled by the contemporaneous exposition; that Massachusetts, from the planting of the colony, took an open and notorious possession under, according to, and in enforcement of her present doctrine of interpretation, going more than three miles south of what is now the main stream of what is now Charles River; and that during all the period properly denominated contemporary, and down to the year 1750, neither the crown, nor Plymouth, Rhode Island, nor Connecticut, objected to that interpretation, but on the contrary expressly and repeatedly assented to it; Plymouth in 1638 and 1664, Rhode Island in 1711 and 1718, and Connecticut in 1713. And this conduct of Massachusetts, in assertion of her principle of interpretation, and this contemporary assent of all others adversely interested, constitute a body of circumstantial evidence in favor of the Massachusetts interpretation, which would be decisive of the cause on that point alone.

To show, 1. That Massachusetts took and maintained a possession from the earliest period under her present doctrine of construction will be cited, — Bill, 29, 30, 34, 35; Evidence of R. I. 47, 56, 63, 104; Borden's Evidence, 3; 1 Winthrop's Journal, 284; 1 Hutch. 108; 1 Trumb. 185, 186, 401, 402; Connecticut Memorial, 4, 8; Answer, 5; Ev. of R. I. 53, 90, 101, 104, 105, 111, 119, 121; 1 Hutch. 208; Mass. Rep. of 1791, p. 3; Mass. Ev. 22.

2. To show assent of Plymouth, Connecticut, and Rhode Island. 1. Plymouth, — 1 Wint. 284; 1 Hutch. 208; 1 Doug. 401; Mass. Rep. 1791, p. 3. 2. Of Connecticut, — Ev. of R. I. 89, 121, and Connect. Memorial, 4. 3. Rhode Island, — Mass. Ev. 22; R. I. Ev. 56, 61.

3. To show that Massachusetts would not have asserted such a possession, on such a doctrine of interpretation, unless she had believed it sound, and that she knew the true meaning of her charter, see 1 Met. 388; 1 Bancroft, 439, 440, 474, 476; 1 Hutch. 229,

249 – 251 ; 1 Belknap, 106, 107, 113, 115, 116 ; Minot, 38, 43 ; Brad. Hist. of Mass. 94, 5 ; R. I. Ev. 46 ; 2 Doug. 92.

4. That Connecticut assented with full knowledge of localities. Conn. Mem. 3, 4, 5, 7 ; R. I. Ev. 104, 121.

If the court should be of opinion that the complainant's interpretation is established to judicial certainty, still the respondents contend, that, by reason of matter *ex post facto*, the bill cannot be maintained, —

1. The complainant's charter bounds Rhode Island, not on the charter line of Massachusetts, but on her actual occupation at the time, which extended south to the present line. 14 Peters, 247.

2. By the Declaration of Independence the then existing boundary-lines of the States became the true lines, without regard to their historical origin, and those lines are unalterable by any jurisdiction. 12 Peters, 681.

3. That it is not competent for the complainants to bring the matter of this boundary into contestation in a court of equity, by reason of their prolonged and gross laches. 1 Story's Eq. 73 (§ 64, *a*) ; 1 Howard, 168, 193 ; 2 Story's Eq. §§ 1520, 1522 ; 2 Story's R. 215 ; Bell *v.* Sanborn, 8 Clark & Fin. 650 ; 1 Story's R. 215 ; 13 Pick. 393 ; 9 Peters, 417 ; 5 Johns. Ch. R. 550. They are barred by time. 7 Paige, 197 ; 6 Peters, 61 ; 2 Jac. & Walk. 191 ; 2 Molloy, 157 ; 12 Eng. Ch. R. ; 2 Sch. & Lef. 636.

4. That the respondents have a perfect and indefeasible title to soil and jurisdiction up to the existing line, by prescription, a title resting on a possession of more than a century, the highest and most sacred of the titles of nations. 14 Peters, 260, 261.

5. That the existing line has been conclusively established by accord, compromise, award, and treaty ; by the deliberate agreements of agents, arbitrators, or ministers plenipotentiary of the complainants, whose acts were subsequently expressly and by implication ratified by the complainants themselves, as a government.

And hereunder the respondents will contend, —

1. That, in 1711, and again in 1718, commissioners were appointed by Rhode Island and Massachusetts, with full powers to determine and settle, by compromise or ascertainment, the line of boundary ; and that they did agree and establish the now existing line as the boundary. R. I. Ev. 53, and *id. seq.*

2. That, in making this determination of the line, the commissioners of Rhode Island had full knowledge of all material facts ; and that they were uninfluenced by any representations of the commissioners of Massachusetts ; and that, if this be so, the case is concluded. 14 Peters, 260. And in support of this position, the respondents will rely on the want of proof of the complainants to show such mistake or misrepresentation, on the legal presumption

against it, on the probabilities, and on the direct and circumstantial evidence in the case.

1. That the presumptions are against it appears, because to have been ignorant of material facts would manifest a gross neglect of official duty ; and this is never presumed. Greenleaf, § 40, p. 47 ; 2 Cow. Phill. 296 ; 12 Wheat. 69 ; 3 East, 199 ; 19 Johns. R. 347 ; 11 Wheat. 74.

2. Mistake of law alone is no ground of relief. 12 Peters, 32. That they must have known the localities. Mass. Ev. 22 ; R. I. Ev. 52, and *id. seq.* 55, 57.

3. That in the absence of fraud and misrepresentation of the commissioners of Massachusetts, mistake of facts by the commissioners of Rhode Island would be no ground of relief against the agreements ; and that there is no proof of such fraud or misrepresentation. 14 Peters, 280 ; 1 Story's Eq. §§ 146 – 151 ; 2 Wheat. 178 ; 11 Wheat. 59 ; 11 Merlin, 70 ; 6 Toullier, 62 ; 4 Johns. R. 566 ; 9 Heineccius, 101 ; 9 Dowl. & Ryl. 731 ; 1 Story's Eq. § 1456 ; 14 Peters, 276 ; 6 Pick. 154.

4. That the votes of the Rhode Island Assembly in 1711, 1718, 1719, and 1749 (in Rhode Island Evidence), and her long acquiescence, prove or work a ratification of the acts of her commissioners. That mere silence and inaction alone, so long continued, would prove or work it ; but these are unequivocal acts. Story on Agency, §§ 253, 255, 256.

5. That, to avoid the operation of those votes and acts, it is not legally competent to aver that the Assembly and government of Rhode Island were ignorant of the localities or other facts ; and that, if it were competent to make that averment, it is disproved by all the presumptions, and direct and circumstantial evidence. 2 Cow. Phill. 288 ; 12 Wheat. 70, 76 ; Ang. and Ames on Corp. 175 ; 11 Peters, 603 ; Fletcher *v.* Peck, 6 Cranch, 129. See, too, the cases *supra* to the point that official duty is presumed to be done.

6. That if the existing line is to be deserted, and a new one run according to the true sense of the charter, as an open question, it must be removed far south of its present place. Ans. 6 and 7.

In illustration of the points stated above on the part of the complainant, *Mr. Randolph* occupied three days in referring to and reading ancient grants and documents and other papers.

*Mr. Choate* confined himself to that branch of the argument resulting from the two following points, viz. : —

1. The true interpretation of the charter.
2. The acts of 1713, 1718, &c.

The skeleton of *Mr. Webster's* argument was this.
The case of Rhode Island rests on two propositions : —

1. That the disputed territory belongs to her, according to the true construction of the original charters.

2. That she has done nothing to abandon, surrender, or yield up her original right to the territory, or to close inquiry into those original rights.

Against these, we maintain four propositions.

1. That the territory belongs to Massachusetts, according to the just interpretation of her original charter, and that no subsequent acts of the British crown or courts of law, nor any acts of her own, have impaired or lessened her right in this respect.

2. That the line up to which she now possesses has been seated and established by fair and explicit agreements between the two parties, executed without misrepresentation or mistake, and with equal means of knowledge on both sides ; and that she has held possession accordingly, from the dates of those agreements.

3. That if all this were otherwise, Massachusetts is entitled, by prescription and equitable limitation, to hold to the limits of her present possession.

4. That Rhode Island, by her own neglect or laches, is precluded from asserting her claim to the disputed territory, if she ever had such claim, or from opening the question for discussion now.

*Mr. Whipple,* in reply and conclusion.

The case naturally divides itself into three separate and independent questions.

1. Did the disputed territory belong to Rhode Island by virtue of the charter of 1691, commonly called the Province charter ?

2. If the court should decide that question in the affirmative, the next question will be, Has Rhode Island transferred a portion of that territory by the contracts of 1710–1718 ?

3. If the rights of Rhode Island were not affected by those contracts, then the third and only remaining question will be, Are they impaired, or in any way affected, by time ?

I. Did the Province charter of 1691 confer this territory upon Rhode Island ? The counsel for Massachusetts very correctly commence their arguments with the propositions, that inasmuch as Rhode Island has admitted this territory to be the territory of Massachusetts by the contracts of 1710–1718, and has suffered Massachusetts to remain in possession from 1710 down to the present time, that it is incumbent upon Rhode Island, in order to counteract these adverse influences, to establish a title under the charter so clear, that no two minds can possibly differ concerning it.

By this test we are willing to stand or to fall. The title of Rhode Island under the charter is so clear that no two minds can differ about it. Hardly an attempt has as yet been made to impeach it. The very statement of the question settles it.

The charter of 1628 describes the territory of Massachusetts as lying between a line "three miles north of the Merrimack River and of any and every part thereof," on the north, and a line "three miles south of Charles River, and of any and every part thereof, on the south." The lines thus limited on the north and south were to be east and west lines, parallel to each other. The southern line of Massachusetts, by the subsequent charter of Rhode Island, in 1663, is constituted the northern line of Rhode Island.

We contend that these words, yielding to them their obvious and natural import, admit of no doubt. Three miles south of Charles River, and of any and every part thereof, is no more than three miles south of Charles River, and of any and every part of Charles River. These latter words were intended to embrace all the southern curves of the river. Rhode Island contends that the northern line of Massachusetts was intended to be three miles from the Merrimack proper, or the main stream, and the southern line three miles from the most southerly part of the main stream of Charles River; that this construction is imperiously called for by the natural and obvious import of the words, and by the contemporaneous construction of all the parties, grantors and grantees, the crown and all the adjacent colonies, including Massachusetts, from 1622 down to 1710.

1. What is the obvious meaning conveyed by the words "three miles south of Charles River"? Do they comprehend a tributary stream, the head of which may be ten or fifty miles south of the Charles? Do the words "three miles west of the Mississippi River," mean three miles west of the sources of its tributary, the Missouri? Would a grant of territory (either between nations or individuals), ten miles north of the Ohio River, or any part thereof, include all the territory two hundred miles northward, because the Wabash, its principal tributary, extended that distance north? Why have different names been assigned to tributary streams, in ancient and modern times, and by all nations, savage and civilized, if the main stream included the tributary? Have geographers or historians ever described Frankfort and Treves as cities upon the Rhine, because upon streams emptying into the Rhine? Or have they invariably been named as upon the Maine and the Moselle?

Webster defines a river to be "a large stream of water flowing in a channel toward the ocean, a lake, or *another river*. A large stream, copious flow."

Johnson says it is "a land current of water bigger than *a brook*."

In 1642, Massachusetts surveyed a small stream running from the south into the Charles, as and for the Charles River of the charter. At that early period, the main stream had acquired the name of Charles River, far to the westward of its junction with the brook. But the surveyors of Massachusetts called the brook

Charles River, and mapped it as Charles River, — as the main, stream; — omitting to lay down the river itself. As early as 1670, this brook had acquired the name of Jack's Pasture Brook, notwithstanding the attempt of Massachusetts to impress upon it the name of Charles River. Before 1700 it acquired the name of Mill Brook, mills having been built upon it. All the public and private grants of towns, corporations, and individuals referred to the main stream as the Charles, and to this brook as Jack's Pasture Brook, or Mill Brook.

The people of Massachusetts made the same distinction between a river and a brook, one of its tributaries, that all the other members of the human family had made from the creation of the world down to that period. We say, therefore, that the words of the charter admit of but one construction, and never have received a different construction.

This was the construction put upon those words by the grantees of the territory and jurisdiction, and by the grantors of the territory, the Plymouth Company, and the grantors of the jurisdiction, the king and council. All the parties, Massachusetts and the grantors of Massachusetts, so understood these words, and limited their possessions accordingly.

The extended construction now contended for would have carried the northern line of Massachusetts to Lake Winnipiseogee, and an east and west line from that lake would have embraced all the State of New Hampshire, and nearly all of Maine.

But as early as December 30th, 1621, the Council of Plymouth granted to Sir Robert Gorges a territory ten miles by thirty, in the northern part of Massachusetts Bay, embracing Salem, Cape Ann, &c.

In 1628, the same Council of Plymouth granted to Massachusetts a line running east and west, three miles from the Merrimack River.

In 1629, the king and council granted jurisdiction over the territory ceded to Massachusetts by the Plymouth Council.

In November, 1629, the same Council of Plymouth granted what is now called New Hampshire, beginning at the Merrimack River.

In April, 1635, another grant was made to Mason, from said Council, of New Hampshire, with a slight difference of boundaries. In consequence of these subsequent grants as far south as the Merrimack, Massachusetts, in 1636, erected her bound-house three miles north of the Merrimack proper, near its junction with the ocean. When pressed with this fact by Mason, in the trial before king and council, in 1676, Massachusetts gave to this house the name of a possession-house. But it must be observed that Massachusetts never claimed that her territorial rights extended more than three miles north of the Merrimack proper. In the trial be-

fore the king and council, in 1676, she formally renounced any such claim.    Her grant of jurisdiction by the king, in 1629, is over the territory (described by the same words, *verbatim*) that was granted to her by the Council of Plymouth.

The ambitious pretensions of Massachusetts to an extension of her jurisdiction over New Hampshire and Maine, the territorial rights to which were in Mason and Gorges, arose out of the fact, that, after 1636, the inhabitants of New Hampshire, being destitute of the powers of government, petitioned the General Court of Massachusetts to be taken under their government and protection. Massachusetts refused to grant these petitions for a number of years. She had erected her bound-house three miles north of the Merrimack proper.    She had refused to take the inhabitants of the towns adjoining immediately north under her protection, because she was aware that her jurisdiction did not reach them.    In her answer to the charge of Mason before the king and council, in 1676, she admits "that her whole management in those eastern parts was not without the reiterated and earnest solicitation of most of the people there inhabiting."

When her ambition had become fully awakened by these reiterated and earnest solicitations, she employed Woodward and Saffrey to run her north and south lines, and after discovering that a river comprehends all its tributary streams, they run their line on the north so as to comprehend New Hampshire and Maine, and on the south so as to comprehend the territory in dispute.

This extraordinary claim resulted in a series of suits, which extended over a period of nearly a century, in every one of which the pretensions of Massachusetts were overruled.

In 1676, a formal and protracted trial was had between Mason and the colony of Massachusetts, before the two chief justices of England, sitting for the king and council.    The complaint of Mason and the answer of Massachusetts contain the elements of the whole controversy.    Massachusetts formally renounced any claim to the territory more than three miles north of the Merrimack proper.

In a subsequent trial in relation to the rights of New Hampshire, in 1737, she filed her written claim to begin at a point three miles north of the Merrimack, where it empties itself into the ocean, and to follow the course of the river to the crotch, where the union of two tributary streams form the Merrimack proper, thus disclaiming, as she did in 1676, the whole tributary-stream principle, — the whole principle upon which she bases her right to the territory now claimed by Rhode Island.

We find, then, that Massachusetts herself, in 1636, and all the grantors of Massachusetts, the Plymouth Council as to the territory, and the king and council as to jurisdiction, had given to these words, " three miles from Charles River," the construction which

Rhode Island now gives to them ; the construction which has been given to them among all nations and in all ages.

A very faint attempt has been made to disturb the smoothness of this current of authority by a resort to contemporaneous grants of territory and jurisdiction. The result of that attempt was, that in every case where the boundary has been " a river " simply, the tributaries and sources of the river have been excluded. New York, in one instrument, came east as far as Connecticut River. She did not claim east of the river proper, to the heads of the easternmost tributary stream, but to the river itself. When the heads and sources of rivers were intended, " to the uttermost heads and sources thereof " were the expressions invariably employed.

After the most minute and widely extended search into all the grants, public and private, from 1620 down to the present period, not an instance has been found in which a boundary by a river has ever been extended beyond the river itself.

We therefore say, that the construction given to these words by the parties themselves, grantors and grantees, accords with their obvious and ordinary meaning.

But if any additional matter could strengthen these views of this question, it will be found in the fact, that in 1676 this construction was given to these words by the king and council ; in 1684, the charter of Massachusetts of 1628 was vacated and declared void, and in 1691, another charter, called the Province charter, was granted. The limits of Massachusetts, both as to territory and jurisdiction, were expressed by precisely the same words as those contained in the charter of 1628. Upon these words, the grantors had impressed a certain meaning, no matter for this purpose whether the ordinary or an extraordinary meaning. The grant of 1628, unlike a grant of property, was revocable in its very nature. A grantee of jurisdiction, or other political power, holds by no other tenure than the discretion or caprice of the granting power. Massachusetts existed as a colony during the will and pleasure of the king and council. She might be deprived of a part or the whole of her jurisdiction at any moment, and with or without any sufficient cause. It belonged to the king and council to decide arbitrarily, if they chose, how much or how little should be granted or taken away. It belonged to them to explain the meaning of the terms by them employed. Their action in this respect is legislative, rather than judicial, and the effect of their action is conclusive upon all mankind. Massachusetts accepted the Province charter of 1691 from the king and council, after the same king and council had decided, in 1676, that three miles from Charles River meant from the main stream, or Charles River proper.

It is unimportant, therefore, what this court may deem to be the usual and ordinary meaning of these terms. The granting party here has explained the sense in which these terms are used in this

grant. The party to whom the grant was made knew that such was the meaning of the grantor, and by that explained and understood meaning — explained by one party, and understood by the other — must this court be governed.

On the part of Rhode Island, therefore, we say, that we do show, beyond the capacity of the human mind to doubt, that, under the Province charter of 1691, the south line of Massachusetts and the north line of Rhode Island was a due east and west line, beginning at a point three miles south of Charles River proper.

II. In the discussion of the second point, has Rhode Island parted with her right by the contracts of 1710 – 1718, we must consider it settled, that in 1710 she had the right, under the charter.

In order to judge fairly of the effect of these contracts, we must consider their nature and character, the main objects of the parties, their powers in relation to the subject-matter, and the terms employed to express their intentions.

In the first place, the parties agree, that both instruments constitute but one contract.

The commissioners of Massachusetts, in their report of 1791 (p. 59 of Bill), speak of the agreement of 1710 – 1718 as a subsisting agreement. The answer of Massachusetts throughout, but particularly in pp. 20 – 23, treats both instruments as forming but one contract, the agreement of 1718 being in addition, and not a substitute, to the agreement of 1710. Nor is it contended in the argument, that the agreement of 1718 was to take the place of that of 1710.

In the next place, the sole object of the parties was to ascertain the true charter line. From 1705 to 1710, four acts were passed by Rhode Island, appointing commissioners to settle the line according to the charter. Massachusetts and Rhode Island were colonies of the mother country, and both were fully aware that Rhode Island possessed no power to transfer any portion of her territory to Massachusetts. There was an incurable incapacity in Rhode Island to sell, and in Massachusetts to purchase, any portion of Rhode Island territory. Neither possessing the power to sell or to purchase territory, the law will presume that neither had any such object in view. It is not pretended that any consideration was paid to Rhode Island. It must, therefore, be taken as the sole object of the meeting of the commissioners in 1710, to find the dividing line, according to the charter of 1691. The contracts themselves express this as their object, in the most explicit manner. They agree, " that the stake set up by Woodward and Saffrey in 1642, being three miles from Charles River, according to charter, be allowed, on both sides, as the commencement of the line," &c. This line was admitted by the Rhode Island commissioners to be three miles from Charles River, upon the authority of a map of Woodward and Saffrey, made in 1642, as the con-

tract states, "now shown forth to us, and remaining upon record in the Massachusetts government." These commissioners were Governor Dudley and Governor Jenckes. They did not go upon the land, but met at the house of Dudley, in Roxbury, in midwinter, fifteen miles from the localities referred to in the map. If they had been upon the premises, there must have been a surveyor appointed, and the report would have mentioned his name. This map states that the station was three miles from Charles River, according to charter, whereas it is three miles from the head of Jack's Pasture Brook, that brook being called on the map Charles River. By the map of these sworn surveyors, it appears that the station adopted by the commissioners was three miles from Charles River, according to the charter. In point of fact, it was seven miles and upwards. This map was produced by Dudley from the Massachusetts records. What it represents he represented. Jenckes confided in the integrity of this map, and admitted that the starting-point was three miles from Charles River, according to the charter. In point of fact, it was over seven. In point of fact, the Rhode Island commissioner admitted that over four miles of Rhode Island territory belonged to Massachusetts. And this admission was made upon a false representation, through the medium of false papers. This map was the work of 1642, based upon the principle asserted by Massachusetts, and exploded by king and council in 1676, and explicitly renounced by Massachusetts in 1676, and subsequently in 1737.

We have attempted to show, that it was no part of the intention of the parties to transfer acknowledged territory from one to the other, neither possessing the requisite power, but that the only object was to ascertain the line called for by the charter. Rhode Island admitted this line to be the true charter line, upon a false representation. Is she bound by it legally or equitably?

*It being* three miles, according to charter. Was not that fact, it being three miles, the basis of the contract? *Because* it is three miles, *if* it is three miles, as this map states, we agree to run the line such a course to Connecticut River. Suppose it turns out that one or both parties were mistaken, that they began at a station seven miles from the river instead of three, is not the admission void, on the ground of mistake? If the parties had intended to commence at the Woodward and Saffrey station, without regard to its distance from the river, without regard to its conformity to the charter, why were those words inserted in the contract? If they had intended to bind their respective States absolutely, whether the station was three miles or ten miles, why did they insert those words in the contract? Jenckes did not know whether the map was correct or not. He trusted solely to its truthfulness. But in case of error, he did not mean to be bound. He says, "*it being* three miles, according to charter. This is my reason for agreeing

to it." But if the admission is taken to be absolute, and not conditional, then these words are entirely without a meaning. They were inserted as the basis of the contract, or they are surplusage.

Allen v. Hammond, 11 Peters's Rep. 71 ; 1 Story's Equity, 143, b. Massachusetts herself has claimed the disputed territory from 1710 to the present day, not as Rhode Island territory, ceded to her by the contract, but as Massachusetts territory, under the Massachusetts charter, admitted to be such by the contracts. Page 4 of defendant's plea of 1840 ; Answer, pages 6 – 10.

It is a general principle, that where a contract is entered into for the purpose of executing the provisions of a prior instrument, by which the rights of the parties are settled, and the subordinate contract declares that it is made in pursuance of the prior instrument, that any departure from that instrument is presumed to be by mistake. A marriage settlement, declared to be in pursuance of the marriage articles, is void so far as it departs from the articles. Atherly on Marriage Settlements.

In case of a post-nuptial settlement, it is void, though it does not say that it was in pursuance of the articles, because, after the marriage is consummated, the parties have no power to depart from the articles.

This case combines three elements of mistake, either of which is sufficient to invalidate the contract.

1. The contract declares that it was in pursuance of the charter.
2. The parties had no power to depart from the charter.
3. It was made upon a misrepresentation of a material fact.

This is one answer to the effect of the contracts.

Massachusetts attempts to support them, upon the ground that the right under the charter was doubtful ; that Massachusetts claimed under the tributary-stream principle still farther south ; that Rhode Island claimed to Charles River proper, and that, with a knowledge of all the localities, with a knowledge that the map of Woodward and Saffrey was drawn from a tributary stream, the Rhode Island commissioners agreed to the Woodward and Saffrey station.

To this we give various answers.

1. That the right under the charter was not doubtful, but clear and conclusive. The charter gives the line three miles from a fixed and permanent object.

2. There is not a tittle of proof, that the Rhode Island commissioners either knew the localities, or that they knew that the Woodward and Saffrey station was three miles from a tributary stream. On the contrary, all the proof is the other way.

The map itself represents the station to be three miles from Charles River. The contract states it to be three miles from the river, according to charter. The map calls the brook Charles River,

and omits a delineation of Charles River entirely. Instead of laying down the river, and the brook emptying into it, it represents the brook as the only Charles River, and the station as three miles from that only river. The contract itself states that the persons thereafter to be appointed to run the line "were to attend within six months thereafter to show the ancient line of Woodward and Saffrey, and to raise and renew the monuments." This proves that the parties to this agreement were not shown the localities. The line was not run until 1718, and then the commissioners report that they went to the station and run the line, and it does not appear that any of them went near the river, or made any admeasurement of its distance from the station. It was their duty to report all their proceedings, and the law presumes that they performed their duty.

There is another fatal objection to the ground assumed in argument. The court is asked to presume that the commissioners from Rhode Island knew all the localities, knew also that the Woodward and Saffrey station was seven miles from Charles River, and three miles from a tributary stream. If the Rhode Island commissioner knew those facts, it was a fraud in him to conceal them from the legislature of Rhode Island, and to sign a contract which represented the direct reverse,—that the station was but three miles from Charles River according to the charter, when it was seven miles and contrary to the charter. The court is asked to presume that the commissioners stated what they knew to be false. Can this be presumed? If it were true, would it not amount to a designed fraud upon the legislature of Rhode Island?

It is agreed by the answer, that the ratification of these contracts by the legislature of Rhode Island is essential to their validity. Did the legislature of Rhode Island ratify a contract establishing a line three miles from a tributary stream contrary to the charter, or three miles from Charles River according to the charter? If a knowledge of the secret facts, the localities, and the true meaning of the map was essential to bind the commissioners, was it not equally essential to bind the legislature? The obvious meaning of the contract is three miles from Charles River proper. Did the legislature ratify the contract according to its obvious and legal meaning, or according to a meaning impressed upon it by a knowledge of facts which it is not pretended they possessed?

But the whole groundwork of this presumption, which the court is asked to make, that in 1710 Massachusetts claimed from the tributary streams and not from Charles River, wholly fails; for after the decision of 1676, Massachusetts never did claim from a tributary stream.

In 1642, she claimed the right to decide which was the main stream and which the tributary, in point of fact, and she mapped out the brook as the main stream, and called it Charles River.

In 1710, she showed that map as and for a map of Charles River according to charter, and not as a map of a tributary stream.

In 1750, she took depositions to prove the fact, that the brook was Charles River proper.

In 1791, the Massachusetts commissioners say, — " The branch now called Charles River could not have been known as Charles River in 1710." The Rhode Island commissioners say, — " That the Massachusetts commissioners pointed out the brook as and for Charles River." From 1642 down to 1791, the claim of Massachusetts rested upon the fact, that the brook was the main stream, and the main stream its tributary, and they impliedly admit, that if the fact was the other way, the case was against them. Until this trial, Massachusetts has never contended for the right to begin the three miles from a tributary stream, but for the fact that the brook was the main stream.

The fact, that as early as 1640 the public authorities of Massachusetts bestowed the name of Charles River upon the main stream, far to the westward of its junction with the brook, and as early as 1670 the name of Jack's Pasture Brook upon the tributary, and that all the boundaries of the towns and private conveyances treated and called the one the main stream, the Charles River proper, and the other the brook, is proved so clearly and decisively that it is not even brought into dispute. The further fact is also proved, that it is obvious to the senses that the one is the main stream, the other but a tributary.

This conclusive proof rendered it necessary for the counsel to shift the ground of defence, and to contend for the first time during the history of this controversy, that Massachusetts had always claimed from a tributary stream as such ; that, in 1710, Rhode Island knew all the localities, and intended to allow the validity of that claim, although the language of the contract is precisely the reverse.

In 1749, the Rhode Island commissioners discovered the mistake. Being unable to find the Woodward and Saffrey station, they were obliged to go to the river and measure off the three miles. They then discovered that the line of 1718 was seven miles, instead of three, from the river. They run the line to which we now claim, erected permanent monuments upon it, gave notice of their claim to Massachusetts, and have claimed to that line from that day to this.

We therefore contend : — 1. That the right to this territory under the charter is established as clear and certain. 2. That the contracts of 1710 and 1718 were not intended to convey Rhode Island territory to Massachusetts, neither party possessing the power to convey or to purchase. 3. That these contracts were merely admissions that the station was three miles, when in fact it was seven, from the river. 4. That these admissions were made upon

an obviously false statement of the facts, and are not binding in law or in equity.

These are some of the leading views of the Rhode Island mind upon these vital points of the case, and we have been largely encouraged that they are unanswerable, by the fact, that notwithstanding the extraordinary power of intellect arrayed against us, they remain wholly and entirely unanswered.

Taking it for granted that what has not been answered by counsel will not be overruled by the court, we now proceed to inquire whether the jurisdictional right of Rhode Island, secured to her by a record of the highest and most enduring nature, has been lost through the agency of time.

To our minds it seems a clear proposition, that if time is to exert any influence over the rights of the parties in this case, that influence must be based upon principles never as yet promulgated in the code of any municipal or national law which has come to our knowledge. The artificial system prevailing in the courts of common law and equity, in England and in this country, has been more largely inflated, and made deeper and broader encroachments upon the domain of practical justice and common sense, than any previous system within the range of our learning. Yet that system, extended as it has been by ambitious book lawyers and book judges, contains no form of action capable of bringing time into hostility with any one of the rights or claims of Rhode Island, in the present case.

In the first place, the main reason why time is so prolific of presumptions against the party out of possession is founded upon the ceaseless and untiring activity of avarice. The love of money is the basis of all prescription, presumptions of grant, and statutes of limitations. It is against human experience, that any man should allow another to receive the rents and income, and other benefits of his property, for a series of years, claiming it as his own, and remain silent under such encroachment. The law presumes it more probable that there has existed a lost grant, than that such an anomaly should take place. It is because the man in possession enjoys great advantages, and the man out of possession sustains great losses, that the law so readily concludes the title to be according to the enjoyment. This reason, in many cases, if not in all, would apply but awkwardly to jurisdiction,—a duty, and oftentimes an onerous, sometimes a dangerous, duty, which, instead of courting, we gladly escape from,—and not, like property, an enjoyment, a benefit, indeed, the greatest of worldly blessings in the opinion of the mass of mankind. To forego the performance of a duty does not impregnate time quite so quick with a presumption of the absence of all rights, as to forego the enjoyment, it may be, of many thousands of dollars of income, claimed by another, enjoyed by another, with a denial of our right by another.

Then, again, time quiets long possessions of property upon a principle of policy. Property passes from parent to child, it is transmitted by will, transferred by deeds and other instruments, and in the course of forty or fifty years it acknowledges, it may be, as many distinct owners, many if not the most of whom took it for granted, that the peaceable and undisturbed possessor was the legitimate and undoubted owner. The law encourages this belief, for otherwise no improvements would be made. Heirs, devisees, and purchasers would be unwilling to hazard large expenditures, if a flaw in a deed, or even the entire loss of the paper title, could not be cured by the salutary and benign influences of a long and undisputed possession. But jurisdiction is a chaster and less prolific character. She has no heirs, or devisees, and but here and there a purchaser. Third persons will not be discouraged from making improvements by large expenditures of money, because in the first place there are no third persons connected with jurisdiction, and in the next place, jurisdiction amplifies and enlarges itself without expenditures of any kind, and the policy of the law is to restrain rather than encourage these expensive propensities. It must therefore be admitted that the application of the benign influences of time to such a subject as jurisdiction would be rather gawky, old-maidish, and ungraceful.

But suppose we bring this subject of jurisdiction within the range of all the principles applicable to property ; has time any ordinance, any form of action, that can in the slightest degree affect the rights of Rhode Island ? We say with the most entire confidence that it has not.

There are but three modes known to the courts of law or equity, in which time exercises her influences upon permanent property ; — 1. By statutes of limitations ; 2. By prescription ; and 3. By presumptions of grants.

It is not pretended that statutes of limitations can apply to the case of two states. It would be equally absurd to invoke the common law doctrine of prescription, as administered at law or in equity, for to this day, in England and in this country, prescription is overthrown if the person out of possession can show that the possession commenced at any time subsequent to the 1st of Richard the First. Best on Presumptions (47 Law Library), 75 ; Taylor *v.* Cooke, 8 Price, 650 ; 2 Bl. Comm. 31 ; Fisher *v.* Greaves, 3 Eagle & Younge, *Tithe*, C. 1100.

" The presumption of prescriptive rights, derived from enjoyment, is instantly put an end to, where the right is shown to have originated within the period of legal memory," that is 1 Rich. 1 (1189).

Massachusetts was not settled until 1620, and the charter under which she claims was granted in 1628.

In the two first modes in which time operates upon title, she

acts alone, unaided by any other proof, direct or circumstantial.
If the period required by the statute of limitations has transpired, or
if the possession has been as far back as memory extends, the law
presumes that it was coeval with Richard the First, and in both
cases time alone constitutes a legal title.

But with the exception of the case of a mortgage, and one or
two other analogous cases, time alone, unaided by circumstances,
is never sufficient for the third form of its action, by way of pre-
suming a grant.

In Mayor of Kingston v. Horner, Cowper, 102, Lord Mans-
field says, — " A jury is concluded by the statute of limitations.
So in the case of prescription, if it be time out of mind, a jury is
bound.    Any evidence showing a time when the claim did not ex-
ist is an answer to prescription."    p. 109.

" But length of time, as evidence, may be left to a jury to be
credited or not, according to circumstances."

" There is no positive rule which says that one hundred and fifty
years, or any other length of time within memory, is a sufficient
ground to presume a charter."

The more modern authorities are all collected in Best, and the
well settled doctrine in England and in this country now is, that the
presumption of a grant is a case of circumstantial evidence, of
which time constitutes but a single link.

A jury must believe that a grant was actually made.    6 Cowen,
706 ; 3 Johns. R. 109, 269 ; 1 Wash. C. C. Rep. 70 ; 2 Wend.
13 – 15 ; 3 Connect. R. 431 ; 11 East, 279 ; 5 Barn. & Ald.
228 ; 3 ibid. 150.

This court, in Ricardo v. Williams, 7 Wheat. 59, say, — " Pre-
sumptions of grant can never arise where all the circumstances are
consistent with the non-existence of a grant.    *A fortiori,* they can-
not arise when the claim is of such a nature as is at variance with
the existence of a grant."

The facts of this case conclusively show, that no presumption
of a grant (other than the charters and the contracts of the parties,
upon the construction of which the case depends) can for a moment
be indulged in ; because, —

1. From 1628 down to 1775 there was no power competent to
make a grant except the mother country.    Massachusetts and
Rhode Island were colonies, and it is not denied that, up to 1775,
they were incompetent to convey territory or jurisdiction.

2. No other grant from the crown can be presumed (than the
charters of 1628, 1691), enlarging the limits of Massachusetts, be-
cause all such grants are enrolled, and by the well settled law of
England an enrolment cannot be presumed without proof of a spolia-
tion or hiatus in the record.    In 3 Barn. & Ald. 150, Abbott,
C. J., says, — " No instance can be found, where the court have

said that an enrolment has been presumed." See, also, Best on Presumptions, 149.

But such enlarged grant must not only have been recorded in England, but in Massachusetts and in Rhode Island, and no such grant would have been made without the most formal notice to both the parties to be affected. No confirmation of the contracts of 1710 and 1718 can be presumed, for the same reasons. Such confirmation must have been upon notice, and would have appeared upon the records of the mother country and both the colonies interested.

III. Any additional grant from the mother country, or from Rhode Island, after 1775, is not only inconsistent with the circumstances of the case; but at war with its whole history from 1710 to the present time. Because any grant prior to 1775, or any confirmation of the contracts of 1710 and 1718, would have been enrolled in the mother country, and upon the records of both Massachusetts and Rhode Island, and any grant by Rhode Island since 1775, or confirmation of the contracts of 1710 and 1718, must have been recorded in Massachusetts and Rhode Island. Some human hands must have touched these grants or confirmations, and some human eyes must have seen them, and when lost from all three of their beds of repose, a hiatus, or lost stick, must have appeared upon the record-books.

How is the fact? The mistake in the admissions of the Rhode Island commissioners (we omit to call it an imposition) was not discovered until 1748. From that time down to 1825, scarcely a year has elapsed during which commissioners from both the States have not been appointed, or continued under former appointments, for the purpose of settling this long-pending dispute. Frequent meetings have been had. All their conversations, arguments, and claims have been in writing, and reports of those conversations made to the respective legislatures of the two States. From the first to the last, no pretence has been made of any hiatus in the records in England, or in either of the two States. Not a syllable has been lisped of any other title than the charters of 1628 and 1691. From first to last, the claim of Massachusetts has been, and now is, that the territory was hers by charter, that the contracts of 1710 and 1718 conceded the territory as the chartered right of Massachusetts.

It is admitted, it is made the sole foundation of the opposite argument, that, as long ago as 1642, Massachusetts surveyed this territory, and took possession up to the Woodward and Saffrey line, by virtue of the charter, that she has occupied and claimed it from that time down to the present by virtue of the charter. All this is irreconcilable with any other title. Besides, during the period from 1748 down to 1825, neither party, in their various and frequent discussions, pretended that any other question existed between them than what was the proper construction of the charter. Both

admitted that the whole title rested upon that instrument. Massachusetts contended that Jack's Pasture Brook was the main stream in 1710 and 1718, though it had since become a tributary, and Rhode Island contended that it always had been a tributary. As late as 1791, the Massachusetts commissioners, in their report, recommended to their legislature that that question should be referred to arbitrators. In 1750, Rhode Island run the line three miles from Charles River, erected permanent boundaries upon it, gave to Massachusetts a map of that line, with notice that she claimed to it. Here, then, Massachusetts was put upon her defence as early as 1750. Her line, four miles south of ours, was claimed by her as the true charter line. Ours was claimed by us as the true charter line. From that day to this our monuments have stood upon that line, and from that day to this our commissioners have claimed to it. It has been a continual claim. In 1750, Massachusetts took the depositions of witnesses, in order to preserve the evidence of her construction of the charter. All her evidence in favor of that construction is in the case. She knew, then, that at some day or other she must either concede our right by negotiation, or surrender it under legal compulsion. All the moral reasons, therefore, in favor of long possession have no application here. She has lost none of her evidence. The depositions of all her witnesses taken in 1750 are now in the case. None of the legal reasons apply. She took possession under her charter, and therefore can set up no other title. The whole has been a subject of constant dispute from 1750 to 1825, and therefore no presumption of a grant from Rhode Island can arise.

Indeed, it is in vain to attempt to reason upon such a question. It contradicts all our legal and moral instincts to suppose that any principle ever did or ever can exist, which would sanction or even countenance the idea that such a possession, disputed from the moment it was taken to the time of filing the bill, can have any influence upon the title of either party. The law is yet to be made which gives countenance to such gross and glaring injustice.

Mr. Justice McLEAN delivered the opinion of the court.

We approach this case under a due sense of the dignity of the parties, and of the importance of the principles which it involves.

The jurisdiction of the court having been settled at a former term, we have now only to ascertain and determine the boundary in dispute. This, disconnected with the consequences which follow, is a simple question, differing little, if any, in principle from a disputed line between individuals. It involves neither a cession of territory, nor the exercise of a political jurisdiction. In settling the rights of the respective parties, we do nothing more than ascertain the true boundary, and the territory up to that line on either side necessarily falls within the proper jurisdiction.

James the First, on the 3d of November, 1620, granted to the Council established at Plymouth the territory on the Atlantic lying between forty and forty-eight degrees of north latitude, extending westward to the sea. And on the 19th of March, 1628, the Council of Plymouth granted to Henry Roswell and others the territory of Massachusetts, which was confirmed by Charles the First, the 4th of March, 1629. This grant was limited to the territory " lying within the space of three English miles on the south part of Charles River, or of any or every part thereof; and also all and singular the lands and hereditaments whatsoever, lying and being within the space of three English miles to the southward of the southernmost part of Massachusetts Bay ; and also all those lands and hereditaments whatsoever, which lie and be within the space of three English miles to the northward of the Merrimack River, or to the northward of any and every part thereof," extending westward the same breadth to the sea.

On the 13th of January, 1629, the Council of Plymouth granted to the colony of Plymouth, which on the same day was sanctioned by Charles the First, " all that part of New England, in America aforesaid, and tract or tracts of land that lie within or between a certain rivulet or runlet there commonly called Coahasset towards the north, and the river commonly called Narraganset River towards the south," &c.

The Council of Plymouth surrendered its charter to the king the 7th of June, 1635. On the 23d of April, 1662, Charles the Second granted the territory of the colony of Connecticut, " bounded on the east by Narraganset River, commonly called Narraganset Bay, where the said river falleth into the sea ; and on the north by the line of the Massachusetts plantation," &c.

The charter of Rhode Island was granted the 8th of July, 1663, by Charles the Second, limited on the north by the southerly line of Massachusetts.

It thus appears that the disputed line is the common boundary between Massachusetts and Rhode Island ; the latter lying south of the line, and the former north of it. The true location of this line settles this controversy.

More than two hundred years have elapsed since the emanation of the Massachusetts charter, calling for this boundary ; and more than one hundred and eighty years, since the date of the Rhode Island charter. In looking at transactions so remote, we must, as far as practicable, view things as they were seen and understood at the time they transpired. There is no other test of truth and justice, which applies to the variable condition of all human concerns.

The words of the Massachusetts charter, " lying within the space of three English miles on the south part of Charles River, or of any or every part thereof," do not convey so clear and definite an idea as to be susceptible of but one construction. Whether

A 3 *

the measurement of the three miles shall be from the body of the river, or from the head-waters of the streams which fall into it, are questions which different minds may not answer in the same way. That the tributary streams of a river, in one sense, constitute a part of it, is clear ; but whether they come within the meaning of the charter is the matter in controversy. The early exposition of this instrument by those who claimed under it is not to be disregarded, though it may not be conclusive.

This line is said to have been often a matter of controversy between the Plymouth colony and Massachusetts, as early as 1638, and that in that year Nathaniel Woodward took an observation upon part of Charles River, 41° 50' north latitude. In 1642, the southern bounds of Massachusetts were ascertained by the said Woodward and Solomon Saffrey, who fixed a station three miles south of the southernmost part of Charles River. And in 1664, a line was run by commissioners from each colony, and their return was accepted by the General Court of Massachusetts, and ordered to be recorded ; and it may fairly be presumed that the return was also accepted by Plymouth. This was a construction of the charter by Massachusetts, and assented to by Plymouth, that the three miles were to be measured not from the main channel of Charles River, but from the head-waters of one of its tributaries. Grants of land were made by Massachusetts and Connecticut on their common boundary, and also towns were established, without a strict regard to the line, which produced much contention. To adjust these disputes, in 1702 commissioners were appointed by the two provinces to ascertain the boundary-line. They set up their quadrant and took their observation at, or not far from, the distance of three miles south of the southernmost part of Charles River, after which they took a second observation at Bissell's house, called for in the line of Woodward and Saffrey ; and it was found that Massachusetts had made grants and established towns south of the line. This line was finally established by commissioners appointed by Massachusetts and Connecticut, in which they admit the correctness of the beginning at Woodward and Saffrey's station, " three English miles on the south of Charles River, and every part thereof, agreeably to the charter."

Serious difficulties occurred between the border inhabitants of Massachusetts and Rhode Island, on account of conflicting grants, and the establishment of towns. And after much correspondence and legislative action on the subject by the respective parties, it was finally agreed to appoint commissioners to settle the line. In October, 1710, the General Assembly of Rhode Island " enacted, that whereas Major Joseph Jenks being commissionated to treat with Governor Dudley concerning the settling the bounds between the province of Massachusetts and this government ; that in case Governor Dudley and himself should not agree so as to issue the

matter, then Major Jenks is hereby empowered and authorized to offer and conclude on such other terms as he may judge most proper for the interest of the colony," &c.

The commissioners of both colonies met at Roxbury, January 19th, 1710 – 11, and after stating the authority under which they acted, and having "examined the several charters and letters, patent relating to the line betwixt the said respective governments, and being desirous to remove and take away all occasions of dispute and controversy," &c., " they agree that the stake set up by Nathaniel Woodward and Solomon Saffrey, skilful, approved artists, in the year of our Lord one thousand six hundred and forty-two, and since that often renewed, in the latitude of forty-one degrees and fifty-five minutes, being three English miles distant southward from the southernmost part of the river called Charles River, agreeable to the letters patent for the Massachusetts province, be accounted and allowed on both sides the commencement of the line between the Massachusetts and the colony of Rhode Island." Other matters were adjusted according to the line of Woodward and Saffrey, which need not be referred to. This agreement was signed by Dudley and Jenks, and by three commissioners from Massachusetts and two from Rhode Island. In March, 1711, the Rhode Island legislature sanctioned this agreement, by authorizing the line to be run in pursuance thereof, and the agreement was accepted and approved of by Massachusetts.

In 1716, and also in 1717, commissioners were appointed by Rhode Island to run the line under the agreement at Roxbury, jointly with commissioners from Massachusetts ; or if the latter refuse or neglect to act, then to run the line without them. On the 17th of June, 1718, the Rhode Island legislature, after stating that the commissioners had been retarded in settling the line by the agreement made at Roxbury, &c,, — " This assembly, taking the premises under consideration, do hereby enact, constitute, and appoint Major Joseph Jenks, and others, a committee to treat and agree with such gentlemen as are or may be appointed and commissionated, with full power, by the General Assembly of the Province of Massachusetts Bay aforesaid, for the final settling and stating the aforesaid line between the said colonies, hereby giving and granting unto the aforesaid Major Joseph Jenks and others, or the major part of them, our full power and authority to agree and settle the aforesaid line between the said colonies, in the best manner they can, as near agreeable to our royal charter as in honor they can compromise the same," &c.

The commissioners of both colonies met at Rehoboth, the 22d of October, 1718, and under their hands and seals again agreed, " that the stake set up by Nathaniel Woodward and Solomon Saffrey, in the year 1642, upon Wrentham plain, be the station or commencement to begin the line," &c. This agreement being re-

turned on the 29th of October, 1718, was accepted by the General Assembly of Rhode Island, and ordered to be recorded ; and it was also accepted by Massachusetts.   And a joint commission, being appointed by both governments to run the line as established, met on the 5th of June, 1719, and say, — " We, the subscribers, being of the committee appointed and empowered by the governments of the province, &c., for settling the east and west line between the said governments, by virtue of the agreement of the major part of the said committee at the meeting at Rehoboth, on the 22d of October last past, at which time the said line was fully settled and agreed, and by them directed to be by us run.   Having met at the stake of Nathaniel Woodward and Solomon Saffrey, on Wrentham plain, the 12th of May, anno Domini 1719, in the morning, and computed the course of the said agreed line," &c., which line was run by them two miles west of Allom pond, and they erected monuments at different points.   This return was approved by the Rhode Island Assembly.

In October, 1748, the legislature of Rhode Island appointed other commissioners to continue the line to the Connecticut River, recognizing the stake set up by Woodward and Saffrey as the place of beginning.   The commissioners thus appointed having met, in 1749, twice, at Wrentham, and Massachusetts having failed to appoint commissioners to act with them, the Rhode Island commissioners proceeded to complete the running of the line.   In their report they say, — " That we, not being able to find any stake or other monument which we could imagine set up by Woodward and Saffrey, but considering that the place thereof was described in the agreement mentioned in our commission by certain invariable marks, we did proceed as followeth, namely : we found a place where Charles River formed a large current southerly, which place is known to many by the name of Poppotalish pond, which we took to be the southernmost part of said river ; from the southernmost part of which we measured three English miles south ; which three English miles did terminate upon a plain in a township called Wrentham," &c.

These are the leading facts relied on by the respondent to establish the station of Woodward and Saffrey as the place from which the boundary-line was agreed to be run, and in fact was run. And we are now to consider how these facts and the arguments deduced from them are met by the complainant.

In the first place it is insisted, that the line run by Massachusetts, in 1642, was without authority.

There does not appear to have been any order from the crown to run this line, nor is it supposed to have been usual or necessary for the crown to give such an order, where no controversy respecting the line was brought before it.   The general boundary, as named in the charter, was run and established by the colony or

colonies interested; and where there was no dispute no further action was required. The controversy in regard to their common boundary, between Plymouth and Massachusetts, which seems to have existed as early as 1638, was finally adjusted by running the line in 1664. This line was commenced at the place called the angle tree, which is said to be about two miles south of the Woodward and Saffrey station.

When the Woodward and Saffrey station was first established, neither Connecticut nor Rhode Island had a political existence. And the Plymouth colony, which in 1691 was incorporated into Massachusetts, having then a distinct political existence and a common boundary with Massachusetts, assented to the line farther south than the above station. At the time this line was run, neither Connecticut nor Rhode Island can scarcely be said to have had a political organization, as the charter of the former was dated only two years before, and that of the latter one year. Massachusetts, then, in establishing the above station of Woodward and Saffrey, and in running the line, does not seem to have acted precipitately, without authority, or in disregard of the rights of other colonies.

The misconstruction of the charter, in going more than three miles south of Charles River, is earnestly insisted on by complainant's counsel. If the words of the charter were clear and unequivocal in this respect, there would be great force in this argument. It would be decisive of this controversy, unless controlled by other facts and circumstances in the case. But who can maintain that a line to be run "three miles south of Charles River, or of any and every part thereof," is clearly limited to three miles south of the main channel of the river. Can the body of the river with more accuracy of language be called a part of it, than its tributary streams. We call that a part which is less than the whole, when we speak of any thing made up of parts. We do not call a limb a tree, but it is a part of a tree; and if a measurement is to be made from any and every part of the tree, would its branches be disregarded. When we speak of a river, we speak of it as a whole, whether we refer to it above or below a certain point; as bearing north or south, it is the river, in common language, and not a part of the river. The flowing of the water in the channel of the river gives it its name and character, and these are not changed by its length. We speak of the Upper and Lower Mississippi, but neither the one nor the other is called a part of the Mississippi. Had the Massachusetts charter been designed to limit the line to three miles south of the river, would not the language have been, "three miles south of the most southerly bend in the river."

It would therefore seem that the charter may be construed favorable to the respondent. That the construction of the complainant is not a forced one is admitted; and the conclusion natural-

ly follows, that men of equal intelligence may differ in opinion as to the true meaning of the instrument. That Massachusetts more than two hundred years ago construed the charter as her counsel now construe it is clear, and the facts proved authorize the conclusion, that this construction was not, for many years, opposed by Connecticut or Rhode Island, and at no time by Plymouth. But the attention of the court is drawn to the northern boundary of Massachusetts, which the charter describes as " three English miles to the northward of the Merrimack River, or to the northward of any and every part thereof "; which received the construction for which the complainant contends by the king and council.

The northern boundary-line, as claimed by Massachusetts, included Maine and New Hampshire ; and it appears that Mason and Gorges, who claimed under grants, some of which were prior in date to that of Massachusetts, petitioned the king against the encroachments of Massachusetts on territory covered by their grants. The answer of Massachusetts was made, and in 1677 the question was brought before the Privy Council. The title to the land claimed by the petitioners was disclaimed by Massachusetts ; and the king and council held, as to the government, " that if the province of Maine lies more northerly than three English miles from the River Merrimack, the Massachusetts patent gave no right to govern there."

In 1684, the charter of Massachusetts was vacated on a *scire facias*, by the judgment of the King's Bench, and a new charter was granted in 1691, including Maine and Plymouth, but the southern boundary, as regards the present controversy, was not changed.

The northern boundary was again brought before the king and council in 1740, when the decision was, " that the northern boundary of the province of Massachusetts be a similar curve line, pursuing the course of Merrimack River at three miles distance thereof on the north side, beginning at the Atlantic Ocean, and ending at a point due north of Pawtucket Falls ; and a straight line drawn from thence due west," &c. In this decision, the call of the charter was disregarded, on a ground that the tribunal deemed equitable. From this it clearly appears, that the decision was not governed by legal principles, but was an exercise of the king's prerogative ; and by the same power was the former case determined, although the opinion of the judges was taken, so that neither decision constitutes a rule in other cases for the action of a court of law. In the first case, there was a conflict of jurisdiction, which the crown had power to settle, upon principles of expediency, and although the decision purports to be founded on a construction of the charter, yet other considerations may have influenced it. The decision, however, if not regarded as authority in other cases, is entitled to respectful consideration.

To avoid the effect of the agreements in 1711 and 1718, by the commissioners of both governments, in regard to the line in dispute, the complainant alleges, that its commissioners, relying upon the representations of the Massachusetts commissioners, and the words of the charter, did believe that the station of Woodward and Saffrey was within three miles of Charles River; and that the true situation of that station was not known to the authorities and people of Rhode Island until about the year 1750.

The fact of a want of this knowledge, after the lapse of more than a century and a quarter, is difficult to establish. It certainly cannot be assumed against transactions which strongly imply, if they do not prove, the knowledge. If the Rhode Island commissioners were misled in the first agreement, as to the locality of this station, it almost surpasses belief, that, seven years afterwards, the subject of the line having been discussed in Rhode Island, and such dissatisfaction being shown by the people as to lead to a new commission, the second commission should again be misled.

It may be a matter of doubt, whether a mistake of recent occurrence, committed by so high an agency in so responsible a duty, could be corrected by a court of chancery. Except on the clearest proof of the mistake, it is certain there could be no relief. No treaty has been held void, on the ground of misapprehension of the facts, by either or both of the parties.

It appears, from the report of John Cushing, that he and others, being a committee to unite with a committee of Rhode Island, did meet at Wrentham, in November, 1709, agreeably to appointment, and being shown the line run by Major-General John Leverett, in 1671, the Rhode Island committee was requested to unite with the Massachusetts committee in renewing that line. But they declined doing so, alleging that they knew the line, but could not recognize it as the true one.

It appears, from several depositions in the case, that the station of Woodward and Saffrey was well known in the neighbourhood, by tradition and otherwise, by the oldest settlers at Wrentham, in the year 1750; and, from Callicott's deposition in 1672, "that, thirty years before, he was present when Woodward and Saffrey established their station, measuring three miles south from a pond out of which the principal part of the river came."

From the year 1750, repeated steps were taken by Rhode Island, in various resolutions, and by appointing commissioners, at different times, to ascertain and run the line in connection with commissioners to be appointed by Massachusetts. Commissioners from both colonies met more than once; but they could make no arrangement changing the line, as established under the agreements in 1711 and 1718. Rhode Island alleged a mistake in her commissioners in the place of beginning, as the ground of these efforts. That the colonies had a right to mark out their boundaries was not de-

nied ; but it was insisted, that they had no power, without the consent of the crown, to change the limits called for in their charters. These controversies were kept up, as Massachusetts alleges, by the border inhabitants, and others, for party effect. However this may be, they seem not to have subsided with the change of government. At one time, an arrangement was made by Rhode Island to take the subject before the king in council, but the appeal was not effected. In 1746, Rhode Island obtained a decision against Massachusetts, before the king in council, in regard to the boundary on the Narraganset Bay. This boundary was claimed by Massachusetts, after the old colony of Plymouth was annexed to it. Up to this time, no dissatisfaction seems to have been expressed by Rhode Island to the Woodward and Saffrey line ; and it is deemed unnecessary to state its acts in detail subsequently, showing its objections, as they led to no practical result. They can be of no importance, except in so far as they may conduce to rebut the presumption of acquiescence from the lapse of time. From time to time, up to 1825, Rhode Island adopted resolutions, appointed commissioners to meet those which should be appointed by Massachusetts for the adjustment of this disputed line, but Massachusetts adhered to the agreements.

This is a general outline of this protracted and important controversy. The facts are not stated, where it did not seem to be necessary to state them ; but their effect on the case has not been disregarded. It now only remains, by a general view, to come to that conclusion which is authorized and required by the well established principles of law.

The complainant's counsel rely mainly upon two grounds : —

1. The misconstruction of the charter.

2. The mistake as to the true location of the Woodward and Saffrey station.

If the first be ruled against the complainant, the second must fall as a consequence. And as regards the first ground, little need be added to what has already been said. The charter is of doubtful construction, and may, without doing violence to its language, be construed in favor of or against the position of the complainant. In this view, the construction of the charter by Massachusetts, assented to by the old colony of Plymouth, many years before Connecticut or Rhode Island had a political organization, is an important fact in the case. Plymouth was interested in restricting the line to the calls of the charter, for the line constituted the common boundary between the two colonies. And as controversies had arisen respecting this boundary, and commissioners been appointed to settle it, the presumption is that the rights of both colonies were understood and respected in the establishment of the line. And the line thus established was two miles south of Woodward and Saffrey's station. When this station was afterwards agreed to as

the place from which the boundary was to be run, Massachusetts seems to have considered the change as prejudicial to her rights.

If the commissioners of Plymouth had construed the charter to extend only three miles south of the most southerly bend of Charles River, they could not have assented to the boundary as run. In the absence of proof, the presumption is not to be drawn that they supposed the line established was only three miles south of the river. Connecticut, after the lapse of many years, assented to the line run from the Woodward and Saffrey station as its boundary, and so did the complainant, in the most solemn agreements, as stated. These proceedings conduce strongly to establish a fixed construction of the charter, favorable to the respondent, unless it be clearly made to appear that they were founded on mistake or fraud.

Fraud is not charged, and we have only to inquire into the alleged mistake.

From the nature of this supposed mistake, it is scarcely susceptible of proof. The words of the charter used by Massachusetts in describing Woodward and Saffrey's station, as three miles south of the southernmost part of Charles River, and the statements in certain reports to the legislature of Rhode Island, and the late survey of Simeon Borden, constitute the facts relied on by the complainant as proving the mistake.

Whatever inaccuracy may be detected in the latitude or longitude of the station of Woodward and Saffrey, as given by them, or in the volume of water of the streams called for, the place being identified will control other calls. Streams are often made to change their direction by the improvements of the country, and their volume of water is increased or diminished by the same cause.

If the representations made by the commissioners of Massachusetts as to the location of Woodward and Saffrey's station, by any plausible construction, came within the charter, there was no mistake of fact on which relief can be given. To sustain the allegation of mistake, it must be made to appear not only that the station was not within the charter, but that the commissioners of Rhode Island, in 1711 and 1718, who signed the agreements, believed it to be within three miles of the river, and that they had no knowledge of a fact, as to the true location of it, which should have led them to make inquiry on the subject.

From the notoriety of Woodward and Saffrey's station in 1711, and from the fact that commissioners of Rhode Island met Massachusetts commissioners respecting this line, at Wrentham, in November, 1709, and professed to be well acquainted with Leverett's line, as appears from the report of Cushing, it is difficult to believe that they, at least, were not acquainted with Wrentham plain, and with the station there established.

This dispute is between two sovereign and independent states. It originated in the infancy of their history, when the question in contest was of little importance. And fortunately steps were early taken to settle it, in a mode honorable and just, and one most likely to lead to a satisfactory result. There is no objection to the joint commission in this case, as to their authority, capacity, or the fairness of their proceeding. An innocent mistake is all that is alleged against their decision. And as has been shown, this mistake is not clearly established, either in the construction of the charter, or as to the location of the Woodward and Saffrey station. But if the mistake were admitted as broadly and fully as charged in the bill, could the court give the relief asked by the complainant.

In 1754, William Murray, then attorney-general, afterwards Lord Mansfield, was consulted by Connecticut, whether the agreement with Massachusetts respecting their common boundary, in 1713, would be set aside by a commission appointed by the crown. To which Mr. Murray replied,—"I am of opinion, that, in settling the above-mentioned boundary, the crown will not disturb the settlement by the two provinces so long ago as 1713. I apprehend his Majesty will confirm their agreement, which of itself is not binding on the crown, but neither province should be suffered to litigate such an amicable compromise of doubtful boundaries. If the matter was open, the same construction already made in the case of Merrimack River must be put upon the same words in the same charter applied to Charles River. As to Jack's Brook, it is impossible to say whether 't is part of Charles River, without a view, at least without an exact plan, and knowing how it has been reputed."

From the settlement referred to up to the time this opinion was given by Mr. Murray, forty-one years only had elapsed. And if that time was sufficient to protect that agreement, with how much greater force does the principle apply to the agreements under consideration, which are protected by the lapse of more than a century and a quarter. More than two centuries have passed since Massachusetts claimed and took possession of the territory up to the line established by Woodward and Saffrey. This possession has ever since been steadily maintained, under an assertion of right. It would be difficult to disturb a claim thus sanctioned by time, however unfounded it might have been in its origin.

The possession of the respondent was taken not only under a claim of right, but that right in the most solemn form has been admitted by the complainant and by the other colonies interested in opposing it. Forty years elapsed before a mistake was alleged, and since such allegation was made nearly a century has transpired. If in the agreements there was a departure from the strict construction of the charter, the commissioners of Rhode Island acted within their powers, for they were authorized " to agree and settle

the line between the said colonies in the best manner they can, as near agreeable to the royal charter as in honor they can compromise the same." Under this authority, can the complainant insist on setting aside the agreements, because the words of the charter were not strictly observed? If it is not clear that the calls of the charter were deviated from by establishing the station of Woodward and Saffrey. But if in this respect there was a deviation, Rhode Island was not the less bound; for its commissioners were authorized to compromise the dispute. Surely this, connected with the lapse of time, must remove all doubt as to the right of the respondent under the agreements of 1711 and 1718. No human transactions are unaffected by time. Its influence is seen on all things subject to change. And this is peculiarly the case in regard to matters which rest in memory, and which consequently fade with the lapse of time, and fall with the lives of individuals. For the security of rights, whether of states or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be involved with greater justice and propriety than in a case of disputed boundary.

The State of Rhode Island, in pursuing this matter, has acted in good faith and under a conviction of right. Possessing those elements, in an eminent degree, which constitute moral and intellectual power, it has perseveringly and ably submitted its case for a final decision.

The bill must be dismissed.

Mr. Chief Justice TANEY.

This case came before the court in 1838, upon a motion to dismiss the bill for want of jurisdiction; and that question was then very elaborately argued at the bar, and carefully considered by the court. Upon that argument, and upon full consideration, I came to the conclusion that the court had not jurisdiction over the subject-matter in controversy, and my opinion to that effect, with a very brief statement of the principles upon which it was founded, is reported in 12 Peters, 752; wherein I have intimated, that at the final hearing of the case I should examine more fully the grounds upon which jurisdiction was asserted in the opinion from which I dissented.

As the case was legally in court under this decision, it became my duty from time to time to take part in the interlocutory proceedings which were necessary to prepare and conduct the case to final hearing. But, after many unavoidable delays, it has reached that point; and we are now to determine whether Rhode Island is in this court entitled to the relief she asks for. Entertaining upon this subject the opinion heretofore expressed, and which has been confirmed by subsequent reflection, I think she is not; and that this court have no constitutional power to decide the question in dispute

between the States, and consequently that the bill ought to be dismissed.

I concur, therefore, in the decree just pronounced, and as I do not dissent from the decree, it is unnecessary to state more fully than I have heretofore done my objection to the doctrines upon which jurisdiction was maintained.

Deciding the case, so far as I am concerned, upon this point, I of course express no opinion upon the merits of the controversy ; and have not even deemed it necessary to be present at the elaborate arguments upon the evidence which have been made at the present term. For if Rhode Island had proved herself to be justly and clearly entitled to exercise sovereignty and dominion over the territory in question, and the people who inhabit it, yet my judgment must still have been, that the bill should be dismissed, upon the ground that this court, under the Constitution of the United States, have not the power to try such a question between States, or redress such a wrong, even if the wrong is proved to have been done.