JAMES M. GROOVER ET AL., APPELLANTS, VS. ANDREW J. COFFEE, APPELLEE.

1. Documents purporting to be issued by the Executive of another State, bearing its seal, are recognized without other proof of their execution than the inspection of its seal.

2. A grant by the Governor of Georgia in 1842 of land lying on the boundary between Georgia and Florida, which land was then, and was for a long time prior thereto, had been considered by her within the territorial limits of Georgia, and incorporated within one of her counties, and over which the authorities of that State had long exercised the usual powers of government, may be received as evidence in the chain of title, although upon a final location of the boundary line by agreement between the States, ratified by Congress, the land falls within the present boundary of Florida.

3. Where the subscribing witnesses are dead, or beyond the jurisdiction of the court, the execution of a deed may be proved by evidence that the signatures of such witnesses are genuine.

4. A deed of the Trustees of the Internal Improvement Fund is *prima facie* evidence of title in the grantee, but such title may be overcome by a superior title.

5. A certificate of the Commissioner of Lands and Immigration, stating that certain lands had been patented by the United States to this State, is *prima facie* evidence with respect to ownership by the State or the Trustees of the Internal Improvement Fund, under Chapter 2063, Laws of 1875. McC.'s Digest, 515, Sec. 10.

6. A certificate of the Commissioner of Lands and Immigration, that a sale of certain land described had been made to a person named at a previous date, such certificate not being a deed, agreement or contract for the sale of lands or a copy thereof, is not evidence under the statutes. Mc.'s Dig., 515.

7. Parol testimony that a certificate of entry of lands at the land office had been issued and had been assigned by the purchaser is not admissible, unless it be shown that the writing has been lost or destroyed, or is in possession of the opposite party.

8. The survey of the boundary line as located and marked by Orr and Whitner under the authority of the States of Georgia and Florida, having been adopted by the Legislatures of the two States on the 8th of February, 1861, as the true boundary line, and the

same having been substantially ratified by Congress in 1872, that line is regarded as the settled boundary between the two States from the junction of the Flint and Chattahoochee rivers to Ellicott's Mound on the St. Mary's river.

9. The State of Georgia, long prior and subsequent to the year 1842. was in actual possession, exercising its jurisdiction and sovereignty, of the territory south of the boundary line as now settled and north of a line called the "Watson line," and in that year granted a quantity of land bounded by the Watson line ; the grantee entered into actual possession under the grant, and he and his grantees have been in the actual occupation and have cultivated the land from that date up to a recent period, when they were dispossessed by one claiming title under a patent issued by the United States Land Office to the State of Florida and a deed from the Trustees of the Internal Improvement Fund. The boundary line between Georgia and Florida had been in doubt and in dispute between these States since 1842, until it was settled by agreement in 1861 between the two States and the sanction of Congress in 1872, and located north of the Watson line ; *Held :* (*a.*) That "grants by a government *de facto* of parts of a disputed territory in its possession" are valid, and the rights to property so acquired "are respected and sacred." (*b.*) That upon this principle of the law of nations the grant by the State of Georgia conferred a right to the property conveyed to the grantee (*c.*) That a subsequent patent issued to a third person by the United States covering the same land does not divest the purchaser from the State of Georgia or his grantees of the title and right of possession claimed under the Georgia grant.

Appeal from the Circuit Court for Jefferson county, the case having been transferred from Madison county.

The facts of the case are stated in the opinion.

*Pasco & Palmer* and *C. W. Stevens* for Appellants.

*Angus Paterson* for Appellee.

In the year A. D. 1839 John Coffee, a brother of the defendant, settled the land in controversy, the same not being in market, and afterwards sold his claim to the defendant. After the said land was patented to the State of Florida as

swamp and over-flowed lands Stripling and McCall entered it from the State, making a part payment and receiving only a certificate, which certificate was transferred to the defendant for value, and in the year A. D. 1874 the defendant procured a deed from the State of Florida, that is, from the Trustees of the Internal Improvement Fund to himself. This land was patented to the State of Florida by the United States in the year A. D. 1850. The plaintiffs claim the land in controversy through a grant from the State of Georgia.

The defendant and Charles A. Groover, the ancestor under whom the plaintiffs claim, were neighbors, and they agreed to let the matter stand until some action would be taken by Congress. And in the year A. D. 1872 Congress did take action in the matter, but did not ratify the Georgia grants, leaving the land as the property of the defendant as the government had conveyed it. Charles A. Groover died before he and the defendant had done anything about the said agreement. However, at the request of Mary J. Groover, his widow and executrix, the defendant sold the land to her, to be paid in annual installments of one hundred dollars each, the first to be made in one year—there was no deed nor writing. At the end of the time instead of making the payment for the land she informed the defendant that she would keep the land without paying for it, as she had been advised by friends. The defendant then (A. D. 1874) brought an action of ejectment against her in her own right and as executrix in the Circuit Court in Madison county, and on her application, she living in Georgia, the case was transferred to the United States Court at Tallahassee, and was tried A. D. 1876, and the verdict and judgment were in favor of Andrew J. Coffee, the defendant herein; and now the heirs at law of the said Charles A. Groover bring this suit, (the said widow not

being a party.) It was commenced in Madison county, but on account of the disqualification of the Judge was transferred to Jefferson county. The verdict and judgment were in favor of the defendant, from which this appeal is taken by the plaintiffs.

If the plaintiffs had connected themselves with the chain of titles which they attempted to make, or had shown any title at all in themselves derived through the State of Georgia, then there would have been but one question involved in this case. That is: Which had a right to the land in controversy, the United States or the State of Georgia?

If the land belonged to the United States in 1819, at the conclusion of the treaty with Spain, then the verdict of the jury is correct; if, on the other hand, the land belonged to the State of Georgia at that time, the verdict might have been different.

The dividing line between the States of Georgia and Florida was, at a very early period, recognized as a line running from the junction of the Flint and Chattahoochee rivers to the head of the St. Marys river. Hodgkiss' Statute Law of Georgia, 83; Code of Georgia (1861), 7 Sec., 21; Thomp. Dig., 4; also 584; Constitution of Florida, 1868, Art. 1; Brightly's Dig., 288, Sec. 2.

The line was not permanently marked until A. D. 1859. This was done by B. F. Whitner on the part of Florida and G. J. Orr on the part of Georgia, and is called the Whitner and Orr line.

There was also a line marked by McNeil known as the McNeil line, which has been noticed by both States. The State Legislature of Florida ratified all grants made by the State of Georgia that might fall south of the Whitner and Orr line, provided they did not come south of the Mc-Neil line. Laws of Fla., 1859, Chap. 1017.

There is a neighborhood line called the Watson line, but it

is not found in the statutes of either State, and is only referred to in the act of Congress passed to quiet titles along the line which the United States had not conveyed. Statutes at Large, 1872, page 52, Chap. 461.

There are none of these acts that give the State of Georgia a right to grant the land in controversy or to make a valid deed. This land lies not only south of the Whitner and Orr line, but also south of the McNeil line, and was a part of the land ceded to the United States by Spain A. D. 1819, and the United States had the right to grant this land to the State of Florida or otherwise.

The Whitner and Orr line is now the acknowledged line between the States of Georgia and Florida, so established and fixed by the States themselves. Laws of Fla. (1859), Chap. 1017; Laws of Fla. (1861), Resolution No. 16; McClellan's Dig. page 952, Secs. 8 and 11 ; Code of Georgia, 1861, pages 6 and 7, Secs. 17 and 21.

And it is the right of independent nations to establish and fix disputed boundaries between their respective territories, and this right belongs to the several States of the American Union with one exception, that is by consent of Congress, and persons claiming land under grants from the States are subject to the conditions of the compact made by the States. Poole vs. Fleeger, 4 Peters, 185; Rhode Island vs. Massachusetts, 12 Peters, 657 ; Garcia vs. Lee, 12 do. and 511.

But even if Georgia had the right to grant the land in controversy the plaintiffs have not made out such a case as entitles them to recover. First, they introduced two Georgia grants to James Groover; second, a deed from James Groover to Thomas J. Groover ; and third, they attempt to introduce a deed from Thomas J. Groover to Charles A. Groover, the ancestor under whom the plaintiffs claim their right, but this last deed they failed to prove. One of the

— 5

subscribing witnesses is alive, and his evidence could have been taken, and he is the only one that could prove the said deed. 1 Greenl. Evi., §569; 3 A. K. Marsh., 77; 13 Am. Dec., 136 and 139; Lewis' Heirs vs. Rings, 3 Marshall, 1109.

The want of the evidence of this witness has caused the plaintiff to fail to show any title whatever in their ancestor, or to connect them at all with the original grant, hence they are not entitled to recover even if the defendant had introduced no evidence, as plaintiffs must depend upon the strength of their own title and not upon the weakness of their adversaries. Hartly vs. Ferrill, 9 Fla., 374.

But the defendant did introduce evidence, and did show his title through the State of Florida from the United States, to-wit: a deed from the Trustees of the Internal Improvement Fund.

These Trustees held the land for the State, with power to sell, and while they had it the State owned it. Laws Fla., (1855) Chap. 610, Sec. 2; Laws Fla., (1856) Chap. 775; Laws Fla., (1870) Chap. 1784, sold to Peas Creek; Laws Fla., (1855) page 57, Resolution No. 3; Laws Fla., (1879) Chap. 3127, where their deed is declared to be evidence.

The land in controversy was patented by the United States to Florida A. D. 1850. Certificate of Hugh A. Corley, Com. L. & I.

This certificate is evidence, and of the same force as the patent itself would be. Laws Fla., (1875) Chap. 2063.

The land in controversy, as soon as it came into market, was entered by Stripling & McCall. Certificate of D. Eagan, Com. of L. & I.; Laws Fla., (1875) Chap. 2063.

But they received no deed, only a certificate, which they afterwards transferred to the defendant, who procured a deed to himself, and is therefore entitled to the land.

The Trustees of the Internal Improvement Fund had the

same possession of the land in controversy that they have in all other internal improvement lands. The State is not to be deprived of its land by squatters.

The verdict of the jury is as it should be. The verbal testimony makes no change in the written evidence, and even if the defendant offered no evidence the verdict should be as it is. And if the verdict is sustained by the evidence it will not be disturbed. Daggett vs. Wiley, 6 Fla., 482.

The Judge's charge to the jury, taken as a whole, is fair and just. He charged the law in each of the three items.

What *are* boundaries is a question of law for the court. *Where* the boundaries are is a question of fact for the jury. 15 Am. Dec., 507; Tatum vs. Paine, 4 Hawks, 64, approved in Marshall vs. Fisher, 1 Jones, 111; Spruill vs. Davenport, id., 203; Clark vs. Wagner, 70 N. C., 707.

There was no dispute as to where the boundaries are in this case, but it is admitted that the land in controversy is south of the Whitner and Orr line; and far south of it, even south of the McNeil line, to-wit: in the State of Florida, hence Georgia could not make a valid title to the land in controversy, and the court had a right to charge as he did. Tolland vs. Sprague, 12 P., 300; 12 Curtis, 729.

The Judge did right in permitting the jury, at their request, to come into court, the counsel for both sides being present, and give them the instruction they asked.

For at the instance of the plaintiff's counsel the court did more than that: after the taking of the evidence was closed at noon plaintiff's counsel asked the court to adjourn until next day that he might examine some authorities before arguing the case, and by consent of defendant's counsel the court adjourned as requested for this purpose, but plaintiff's counsel instead of having authorities had sent to Georgia for a witness, and insisted on opening the evidence next morning after defendant and his witnesses had gone home;

this was allowed by the court; and if this was right then certainly giving instructions to the jury afterwards was right; plaintiff's counsel is the last one that should complain at any rate.

THE CHIEF-JUSTICE delivered the opinion of the court.

This is an action of ejectment commenced by appellants in Madison county and moved to Jefferson for trial. The lands are in Madison county, and described as " about seventy-seven acres in fractional lot number 200 in originally Irwin county, Georgia, and about twenty acres in fractional lot number 199 in the southeast corner of said lot in originally Irwin county, Georgia, both now in Madison county, Fla., said lots being more particularly described as ninety-seven acres in the northern part of fractional section twenty-nine, township three, north, of range nine, east."

Appellants introduced in evidence two patents issued by Governor McDonald, under the seal of the State of Georgia, dated January 1, 1842, granting to James Groover, his heirs and assigns, (in pursuance of an act of the General Assembly passed 23d December, 1822, relating to lands in the territory lately acquired from the Creek and Cherokee Indians,) fractional lot number 199 containing two hundred and twenty-six 2-100 acres and fractional lot number 200 containing two hundred and fifty 2-10 acres " lying and being in the fifteenth district of Irwin county in the said State, * * * having such shape, form and marks as appear by the plat of the same hereunto annexed."

The plats annexed designate the southern line as " Florida line," and dimensions, area, monuments, courses and distances are duly certified by the Surveyor-General of the State of Georgia as being correct, and as having been surveyed on the second day of July, 1820, and the grants

were duly registered by the Secretary of State January 1, 1842.

Plaintiff also put in evidence a deed of James Groover, of Thomas county, Ga., to Thomas A. Groover, of Lowndes county, dated 31st December, 1855, recorded in Lowndes county, conveying the same lands in fee. Also a deed of Thomas A. Groover to Charles A. Groover, of Brooks county, Ga., dated 8th July, 1860, recorded in Brooks county, Ga. The plaintiffs are the heirs at law of Charles A. Groover now deceased.

It was proved that James Groover was in possession of the land in controversy when he conveyed it to Thomas A. Groover, and the latter was in possession when he conveyed it to Charles A. Groover, and that he and his family occupied and cultivated it until they were dispossessed by the defendant in 1876, and the defendant, A. J. Coffee, has been in possession since that year. All the land in question was cultivated by Thomas and by Charles A. Groover while they were in possession.

A plat made by a surveyor was introduced by plaintiffs, showing the location and boundaries, from which it appears that about 120 acres of the lots described as lots 199 and 200 in the Georgia patent and in the deeds falls south of a line called the "McNeill line," and north of the "Watson line." The plat also shows that the lands south of the McNeill line, including the land in controversy, are within the surveys made by the United States and designated by sections, bounded by the McNeill line on the north, so that the 97 acres claimed by plaintiff constitute a part of section 29 according to this plat of the U. S. surveys. It seems to be conceded by both parties that this tract is south of the present boundary line between Georgia and Florida, and hence is treated as a part of the present territory of Florida

and within the county of Madison. Precisely where the State line is does not appear in the evidence.

One of the witnesses (Bentley) says the Watson line was considered the State line. Another (Lanier) says he considers the McNeill line the boundary, and he knows of another line " that runs between the two States still south of the Watson line." Both lines were distinctly marked.

On the part of the defendants there was introduced a deed executed by the Trustees of the Internal Improvement Fund conveying to the defendant the whole of fractional section twenty-nine, township three, north, range nine, east, containing 269 85-100 acres in the county of Madison, State of Florida. This is dated September 12, 1874. Defendant further introduced a certificate of Hugh A. Corley, Commissioner of Lands and Immigration for the State of Florida, dated May 6, 1880, " that the whole of fractional section twenty-nine in township three north, of range nine, east, was patented to the State of Florida as ' swamp and overflowed land ' under act of Congress approved September 28th, 1850, as appears from Patent No. 9, dated July 6, 1857, which patent now remains on file in this office."

Defendant also offered a certificate of Dennis Eagan, Commissioner of Lands and Immigration of the State of Florida, dated January 20, 1874, certifying that " the records of this office show that fractional section twenty-nine in township three, north, of range nine, east, was sold to McCall and Stripling on the second day of September, A. D. 1857."

Defendant testified that his brother, John Coffee, had the land in controversy in 1839, had a " claim " and cleared part of it before it was in market. He bought his brother's claim, and after it was put in market Bryant Stripling and T. Fane McCall entered it and got a certificate which they

transferred to defendant, and he had the title made to himself by the Trustees of the Internal Improvement Fund. Defendant further testified that " Charles A. Groover had a clearing on part of the land in controversy, and I had part of the land in cultivation that was included in my deed south of the Watson line, and as there was a dispute between Mr. Groover and myself about the land we agreed to let it remain as it was until Congress would settle it." Defendant and Mrs. Groover made a bargain for a sale of the land to her. but it was not consummated. Defendant says he then commenced suit and obtained judgment against her for the possession in the U. S. Court, and was thereby put in possession. Until that time defendant did not take actual possession of the land north of the Watson line or make crops on it.

Every document and paper introduced by either party was objected to by the opposing party, and was received by the court and given to the jury as evidence. Other testimony of witnesses was received or excluded upon objections being made, and these rulings will be noticed as they may be deemed material. The court refused to give certain instructions prayed by plaintiffs' counsel and charged the jury, (exceptions being taken to the refusal and to each paragraph of the charge) and the jury found a verdict for the defendant. The plaintiffs (a new trial having been denied) appealed from the judgment, assigning errors in the rulings and charge of the court and in the verdict as against the law and the evidence.

The grants of land by the Governor of Georgia to James Groover were objected to by defendant, " because they were not connected with the case."

Courts recognize, without other proof than inspection, the seals of other States and nations which have been recognized by their own sovereign. 1 Greenleaf's Ev., §479.

The land in question is claimed to have been formerly within the territorial jurisdiction of the State of Georgia, and the land is described in the grants as lying within the county of Irwin in that State. The grants were offered as parts of the history of the title to the land, and in view of the fact that a dispute existed for a long period as to the exact boundary line of the States, and that the law sometimes recognizes titles to property granted by the government exercising the powers of sovereignty for the time being, the documents were properly received as alleged links in the chain of title. Whether they were "connected with the case" depended upon the whole evidence offered. In this aspect the court properly received the documents in evidence.

The defendant objected to the deed of James Groover (grantee of the Georgia patents) to Thomas A. Groover and the deed of Thomas A. Groover to Charles A. Groover, the ancestor of the plaintiffs, on the ground that the execution of the deeds was not sufficiently proved, and that as to the last named deed one of the subscribing witnesses was living and should be called to prove the same.

As to the deed of James Groover, it was shown that he was dead, and the subscribing witnesses were also dead. The signatures of the grantor and of the subscribing witnesses were shown to be genuine. As to the deed of Thomas A. Groover to Charles A. Groover, it was shown that the grantor was living in Georgia, and one of the subscribing witnesses, James G. Groover, was living and was out of the State, residing in Georgia, and the other subscribing witness was dead. Thomas A. Groover was produced and testified to the genuineness of the signatures of both subscribing witnesses, and they were signed in his presence and at his request, and that the one now living was in Georgia.

In all cases there should be strict, diligent and honest inquiry made for the subscribing witnesses, satisfactory to the court under the circumstances of the case, before proof of their hand-writing will be received. And where the subscribing witness to a deed is out of the jurisdiction of the court proof of his hand-writing is sufficient evidence of the execution of the deed without any proof of the signatures of the parties to the deed. (The People vs. Rowland, 5 Barb., 449; 1 Greenleaf Ev., §572, and notes.) This is the recognized rule. These deeds, having been duly proved, were competent evidence.

The grantee of the Governor of Georgia, and his grantees and successors under the same title, were in actual possession of the premises from the date of the Georgia grants (1842) to 1876, when the plaintiffs were dispossessed by the defendant under a judgment in his favor "against Mrs. Groover," as he testifies, up to which time he had never had possession of the land in controversy.

The first evidence on the part of the defendant was a deed from the Trustees of the Internal Improvement Fund of Florida, dated September 12, 1874, conveying to defendant fractional Section 29, T. 3, N., R. 9, E., in Madison county.

This was admitted against plaintiffs' objection that it should be first shown that the grantors had possession when they attempted to convey. Defendant's claim, however, is that the Trustees and the State (whose Trustees they are) derived title originally and direct from the United States, and that this title is superior to any other. As a link in the chain of proofs by which the defendant proposes to overcome the evidence of the plaintiffs' right of possession, the deed was admissible in the first instance. The character of the title held by the Trustees, though not original, is still of such a public character that their deed may be deemed *prima facie* evidence of title in the grantee, subject,

however, to be overthrown by a former or superior grant or other evidence of superior title or right of possession.

In support of the objection the plaintiffs' counsel cite the ruling of this court in Doe *ex dem.* Magruder vs. Roe, 13 Fla., 602. It was there held that there was nothing in the nature of the title of the Trustees which should preclude a party against whom it may be introduced from showing a superior title in himself. In that case the opposing title which the court thought might be shown against the deed of the Trustees was a grant made by the Spanish government before the treaty of cession and actual possession under it, and this might be a better title than could be derived from the State, even though the State had a patent issued from the United States Land Office. The defendant was attempting to show a legal title. The question tried was, which was the better title; either, unopposed, may be *prima facie* a legal title.

The second error assigned by plaintiffs is the admission of the certificate of Corley, Commissioner of Lands, &c., to show a conveyance from the United States to the State. The act of the Legislature, approved February 20, 1875, Ch. 2063, (McC. Dig., 515, §10,) makes such certificate evidence *prima facie* " with respect to the ownership by the State or by the School, Seminary or Internal Improvement Funds of any lands in this State." The certificate offered is embraced in this act. It certifies that the land described was patented to the State as " swamp and overflowed lands " July 6, 1857, and is evidence of that fact.

The third error assigned is that the court admitted the certificate of Eagan, Commissioner of Lands, &c., that a sale of the lands to McCall and Stripling had been made in 1857.

We think this exception is well taken. This certificate is not one of the character recognized as evidence under

the statutes or otherwise. It is not a certificate of owner-
ship by the State or the Trustees, nor is it a deed, agree-
ment or contract, or a copy of any document or record per-
taining to the office of the Commissioner within the mean-
ing of the act of February 20, 1875, Ch. 2063, or the act
of February 20, 1879, Ch. 3127, McC. Dig., 515, Secs. 10, 11.
We find no law making this certificate evidence.

The fourth error assigned relates to the testimony of de-
fendant by which it was sought to prove by parol that
McCall and Stripling had entered the land and procured a
certificate of entry, which they transferred to defendant.
There was no evidence that such certificate had been issued
to McCall and Stripling. No copy was produced, and
there was no evidence that a certificate had been lost or
destroyed, or in the possession of the other party, in order
to lay the foundation for parol evidence of its existence or
of its transfer. If this proof was material as bearing upon
the title or transfer of the right to a patent, parol testi-
mony was not admissible until a foundation for it had been
shown.

As to the fifth error assigned, the admission of proof of
a parol bargain between the defendant and Mrs. Groover
for the purchase of the land by her and its abandonment,
though such evidence was not competent to affect the rights
of the parties to this suit, yet it cannot be considered that
the testimony alluded to had any influence with the court
or jury.

Other grounds of error assigned by appellants are covered,
so far as they seem to require notice in the present case, by
the conclusions which follow.

The appellants proposed several instructions which they
requested should be given to the jury, several of them as-
suming that the boundary line between the States of Flor-
ida and Georgia had never been settled.

The boundary between the two States is a straight line drawn from the junction of the Flint and Chattahoochee rivers to the head of St. Mary's river, thence down the middle of that river to the Atlantic Ocean. This was the boundary fixed by the treaty of 27th October, 1795, between the United States and Spain. (8 U. S. Statutes at Large, 138.) The exact point called the head of the St. Mary's river was a matter of controversy for a long time. Finally it was determined that " Ellicott's Mound " (as marked on the map) should be considered the eastern terminus of the straight line striking the St. Mary's river. Before the erection of this mound as the eastern terminus it had been variously contended on the part of Georgia and Florida that this terminus was northerly or southerly of the mound. Since then Ellicott's mound has been decided by agreement between the States to be the easterly point from which the line should be located. From time to time the Legislatures of Georgia and Florida passed very many acts and resolutions providing or endeavoring to provide for the actual survey, location and marking of the straight line between the two points mentioned, and to effect a settlement of the question. It is a part of the history of the matter that several lines have been run by surveyors employed by the United States and marked, which lines run respectively north or south of the land in controversy.

After much legislation and much communication between the Executives of the two States, in the year 1859 their several Legislatures by acts or resolutions agreed that the line to be run and marked by B. F. Whitner, Jr., on the part of Florida, and G. J. Orr on the part of Georgia, should be recognized as the true boundary line.

On the 8th day of February, 1861, the line run and

marked by Whitner and Orr was declared by the Legislature of each State to be "the permanent boundary line."

Congress, on the 9th April, 1872, passed an act entitled "An act to settle and quiet the titles to lands along the line between the States of Georgia and Florida," declaring as follows : " That the titles to all lands lying south of the line dividing the States of Georgia and Florida, known as the Orr and Whitner line, lately established as the true boundary between said States, and north of the line run by Georgia, known as the Watson line, being all the lands lying between said lines, be and the same are hereby confirmed, so far as the United States has title thereto, in the present owners deriving titles from the state of Georgia."

This act is considered a ratification by Congress of the boundary line as adopted by Georgia and Florida, and we deem the Whitner and Orr line as marked to have been established from the date of the adoption thereof by the two States.

Precisely where this line is with reference to the land in question does not appear by any testimony in the record before us, but it is evidently assumed that it lies north of the lot claimed by plaintiffs, and we therefore consider that the land is within the present boundaries of Florida. That it lies within the territory formerly claimed by Georgia to be within her borders is unquestionable.

This appears not only by the evidence here, but by the history and legislative action of the two States. The true line was a matter in dispute between the respective legislative and executive authorities. Surveyors employed by the United States had run and marked lines south of this land. Up to the time of the agreement by the governmental authorities of the States that the Orr and Whitner line " should be and was thereby declared to be the permanent boundary lines between the States of Georgia and

Florida," (as expressed by the Legislature of this State in the act of 22d December, 1859, and the resolutions of February 8, 1861,) and which line is spoken of in the act of Congress of April 9, 1872, as " the line dividing the States, * * lately established as the true boundary," it was "a case of disputed boundary." It is in evidence that in July, 1820, the Surveyor-General of Georgia caused the land in question to be surveyed and platted as situated in the 15th district in the county of Irwin, State of Georgia; and that it was conveyed to James Groover by the Governor of Georgia January 1, 1842, as land belonging to that State, " in pursuance of the act of the General Assembly passed 23d December, 1822, to dispose of the fractional lots of land in the territory lately acquired from the Creek and Cherokee Indians."

By the convention of 24th April, 1802, between the United States and Georgia, all the public lands south of the southern boundaries of Tennessee, North Carolina and South Carolina and east of the Chattahoochee river, &c., and not within the proper boundaries of any other State, were ceded to the State of Georgia. (1 Laws of U. S., 488, 490.) By the same convention the United States agreed to extinguish all the Indian titles to lands in Georgia for her benefit. This was accomplished by treaty with the Creeks June 16, 1802, and November 14, 1805. 1 Laws U. S., 370, 373.

The State of Georgia, as appears, considered and treated the land in dispute as part of the Indian lands within her borders, and surveyed and sold it to James Groover.

The " Watson Line " is recognized by the act of Congress of April 9, 1872, by confirming to the grantees of Georgia all the interest of the United States in any lands north of that line. We do not mean that the Watson line was recognized as a State boundary, but the United

States thereby recognized the grants made by the State of Georgia as valid against any claim of the United States. Nor do we intend to say that this act of Congress gave any right to plaintiffs in the disputed tract, if the United States had before conveyed it to the State of Florida by the patent of July 6, 1857. Nor on the other hand do we determine that the United States had title as against Georgia to the lands north of the Watson line.

It is not demonstrated by the proofs in this record or from the action of the United States Government or the governments of Georgia and Florida, that the line adopted by these States in 1859 and 1861 to be the permanent boundary between them, was the true line prior to that agreement. It was "adopted" and "recognized" as the settlement of a disputed boundary. The act of Congress of 1872 recognized and acted upon this settlement and mentions it as "lately established as the true boundary," thereby assuming that this "true boundary" had not been before established.

The United States Supreme Court in Poole vs. Fleeger, 11 Peters, 185, in reference to a controversy between grantees of Kentucky and Tennessee, says: "Although in the compact Walker's line is agreed to be in the future the boundary between the two States, it is not so established as having been for the past the true rightful boundary." The court further remarks (p. 209): "It cannot be doubted that it is a part of the general right of sovereignty, belonging to independent nations, to establish and fix the disputed boundaries between their respective territories, and the boundaries so established and fixed by compact between nations become conclusive upon all subjects and citizens thereof, and bind their rights, and are to be treated, to all intents and purposes, as the true and real boundaries. * * It is a right equally belonging to the States of this Union,"

Congress consenting. In that case it was held that the grants made by North Carolina and Tennessee were not rightfully made, because they were originally clearly beyond their territorial boundary, and that the grant under which the claimants claimed was rightfully made, because it was within the well known territorial boundary of Virginia. In that case there was no ground of cavil as to where the original boundaries had been located.

The same court in The State of Rhode Island vs. The State of Mass., 12 Pet., 657, 748, speaking of the principle announced in Poole vs. Fleeger that an agreement between States, consented to by Congress, bound the citizens of each State, says: "There are two principles of the law of nations which would protect them in their property: 1. That grants by a government *de facto* of parts of a disputed territory in its possession are *valid against the State which had the right*. 2. That when a territory is acquired by treaty, cession or conquest, the rights of the inhabitants to property are respected and sacred. 8 Wheat., 589 ; 12 Wheat., 535 ; 6 Pet., 712; 7 Pet., 867 ; 8. Pet., 445 ; 9 Pet., 133 ; 10 Pet., 330, 712."

In the controversy between the States of Rhode Island and Massachusetts, involving their disputed boundary, the matter was again before the Supreme Court in 4 How., 591, 639, and at the close of the opinion of the court this language is used: "For the security of rights, whether of States or individuals, long possession under a chain of title is protected. And there is no controversy in which this great principle may be invoked with greater justice and propriety than in a case of disputed boundary."

The principles cited from the foregoing cases cannot be questioned. They are clearly applicable to the case under consideration.

It is considered established by the record here, in con-

nection with the legislation of Georgia and Florida on the subject of the boundary, that Georgia claimed and exercised dominion of the territory down to the Watson line; that she caused it to be surveyed and mapped in 1820, and the surveys and maps to be recorded in her public records; that the territory was incorporated in the original county of Irwin; that acting under the authority of the Legislature the Governor issued patents to James Groover covering this land, and the same, the plat and certificate of survey, were recorded in the records of Irwin county; that from the date of this patent, January 1, 1842, the patentee and his grantees have, under conveyances recorded in Irwin county and its sub-divisions, been in constant possession by actual occupancy and cultivation down to 1876, when the defendant took possession under some proceeding against Mrs. Groover, and has held possession since that year.

A definitely marked boundary line between the Spanish province of Florida and the United States, or between Georgia and Florida, had never been made and recognized by the governments claiming dominion on either side until the boundary line was run by Orr and Whitner and recognized by the two States in 1859 and by Congress in 1872, whereby further controversy as to the location of the line was closed. Up to that time it was in controversy and doubt.

Congress in 1872 recognized and confirmed the titles granted by Georgia down to the Watson line as against the United States. By numerous decisions of the Supreme Court of the United States it appears that the law of nations has been recognized and adopted as applicable to the States of the Union; that grants by the nationality or the State actually exercising dominion over territory along the line of a disputed boundary, such State having power to

grant lands within its border, as to the " rights of the in-
habitants to property, are respected and sacred."

The claim on the part of the defendant is based upon a
deed of the Trustees of the Internal Improvement Fund
conveying to him in 1874 fractional section twenty-nine,
which, according to a survey and plat in evidence, covers
the land in question.  This survey and plat is supposed to
accord with the surveys made by the United States Sur-
veyors of the public lands in Florida, and this land is de-
scribed in the deed of the Trustees and the patent to the
State as swamp and overflowed land granted by Congress
by act of September 28, 1850, to the State, and by the
State placed in the hands of the Trustees of the Internal
Improvement Fund by the act of January 6, 1855, known
as the Internal Improvement Act.

The court in charging the jury gave this instruction :
" That the State of Georgia had no power to grant a valid
title to the land in controversy," referring to the grant of
Georgia to James Groover January 1, 1842.  This instruc-
tion, in connection with what followed it, was decisive of
the case before the jury.  It determined, as a matter of law
and fact, that the State of Georgia had no power to confer
the title, and that the boundary line between Georgia and
Florida was, at the date of the grant, considered to lie
north of this land, and that therefore it was not included
within the then boundaries of the State of Georgia.

From what has preceded we think this charge cannot be
sustained.  Not only was there no evidence that *at the date
of that grant* the known and recognized boundary line was
north of this land, but the State of Georgia had exercised
dominion and administered its government and laws upon the
territory, granting lands, making surveys and records, and
recording deeds of conveyance of these lands in Irwin

county for a long period from a date anterior to the making of surveys by the United States.

The grant by Georgia was, at least, a " grant by a government *de facto* of parts of a disputed territory in its possession, and is valid against the State which had the right," and " the rights of the inhabitants to property are respected and sacred." 12, Pet., 748.

The case is analagous to that of an adverse possession by one having color of title, and although we do not assert that a right by prescription or under acts of limitation is good against the sovereign power, yet the title of the United States will not prevail, when asserted *merely* by production of its patent, against an antecedent right.

" Neither the law of nations or the faith of the United States would justify the Legislature in authorizing these boards [the Commissioners appointed to ascertain the validity and location of grants of land claimed under the Spanish authorities in Florida] to annul pre-existing titles, which might consequently be asserted in the ordinary courts of the country, against any grantee of the American government." U. S. vs. Clarke, 8 Pet., 436, 445, opinion by Marshall, C. J.

That the right of this grantee under the Georgia patent is superior to that of this grantee of the United States, is a proposition clearly shown in the before mentioned cases, decided by the highest tribunal in the land. The Congress having sovereign legislative power in the matter of the public lands, has never sought to annul these grants made by Georgia, but on the contrary has expressly recognized them.

We are entirely satisfied of the justice of our conclusion that in the case made by the record before us the right is with the appellants.

The judgment is reversed and a new trial awarded.